```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/30/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                         :

ROYCE CORLEY,                 :

                         :

               Plaintiff,   :          1:14-cv-3202-GHW

                         :

        -against-      :     MEMORANDUM OPINION

                         :         AND ORDER

CITY OF NEW YORK, EDMUND DUFFY :
(WARDEN), DEBORAH MOULTRIE,    :
CAPTAIN MCQUADE, CAPTAIN WYNN, :
DEPUTY WARDEN TEXEIRA, RABBI   :
RICHTMAN, OFFICER JOHN DOE # 1, and :
CAPTAIN JOHN DOE # 2,         :

                         :

             Defendants.  :

-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Plaintiff, Mr. Royce Corley, was a pre-trial detainee on Rikers Island in 2012. He claims that

the defendants delayed designating him as Jewish following his request, and, thereafter, delayed

providing him with kosher food, in violation of the Religious Land Use and Institutionalized

Persons Act of 2000, *42 U.S.C. § 2000cc et seq.* ("RLUIPA"). He asserts that the delay resulted from

discrimination against him as an African-American, and that, therefore, it also represented a

violation of his equal protection rights under the Constitution. Mr. Corley raises a number of

additional claims involving the conditions of his confinement and the treatment of him and his

property while at Rikers. Two of the defendants, the City of New York and Warden Edmund Duffy

("Defendants"), have moved to dismiss the second amended complaint under Rule 12(b)(6) of the

Federal Rules of Civil Procedure. They argue that Mr. Corley failed to exhaust his administrative

remedies, and that, as a consequence, the second amended complaint must be dismissed as a whole.

Because it is not apparent from the face of Mr. Corley's complaint that he failed to exhaust his

administrative remedies, the Court denies Defendants' motion to dismiss on the basis of non-exhaustion.  Defendants also argue that, with the exception of his RLUIPA claims, Mr. Corley's complaint fails to state a cause of action.  As described below, Defendants' motion to dismiss is denied in part and granted in part, and Mr. Corley is granted leave to file a third amended complaint.

## I.      Factual Background[1]

Most of the events that gave rise to this lawsuit took place at the George R. Vierno Center ("GRVC"), a jail on Rikers Island, known as "The Beacon."  According to Mr. Corley, the GVRC is designated for the containment of inmates prone to violence, and is used to house such inmates; in particular, members of violent street gangs are concentrated there.  Pl. Aff. ¶ aa.

The general population section of the GVRC has three major sections:  the "Odd-Side," the "Even-Side," and "the Annex."  In 2012, members of the Bloods gang and affiliated groups were housed in the Odd-Side and Even-Side, while the Annex was known for its high concentration of Crips and members of the Patria and D.P.L. Latino gangs.  Non-gang member "neutrals" were sprinkled throughout the complex, based on their security risk group classification.  *Id.* ¶ cc.  According to Mr. Corley, the security risk classification system as implemented at GVRC is arbitrary "and based predominantly on the facilities['] needs to segregate various groups and individual inmates."  *Id.* ¶ ee.  Mr. Corley alleges that the GVRC housed very few inmates who were at a low or medium security risk assessment—instead, the facility was filled with high security risk inmates because of the lack of available space for high classification inmates.

Mr. Corley first entered the custody of the City of New York's Department of Correction

---

[1] The following facts are taken from the plaintiff's second amended complaint, and are accepted as true for purposes of this opinion.  *See* Second Amended Complaint ("SAC" or "complaint"), Dkt. No. 22.  Mr. Corley filed a supplemental affidavit on June 16, 2014 in support of his first amended complaint.  *See* Plaintiff's Supplemental Affidavit ("Pl. Aff."), Dkt. No. 10 at 15-18.  That affidavit was incorporated by reference in the plaintiff's second amended complaint.  SAC ¶ 19(d).  Therefore, the allegations contained in the supplemental affidavit are also accepted as true for purposes of this opinion.

("DOC") on January 26, 2012, when he was briefly detained at the Manhattan Detention Complex ("MDC"), a medium security facility. While at the MDC, Mr. Corley was assessed and his security risk classification was determined to be a five—the lowest security risk category. Nonetheless, on February 2, 2012, without notice or hearing, he was transferred to the GVRC as an "overload," despite its high concentration of high risk inmates. SAC ¶ 19(c). Mr. Corley complained many times about being improperly detained at a maximum security facility despite having the lowest security classification. He asserts that he suffered "significant abuse, physical and emotional injuries due to being improperly and arbitrarily detained at the GRVC." *Id.* ¶ 19(d).

Because he was assigned to a high security facility, with a high concentration of gang members and other high security risk prisoners, Mr. Corley was exposed to gang violence. He recites two incidents relevant to this case. First, he says that once, while waiting alone in the Annex holding pen, an officer on duty "accidentally" placed five Blood members in the cage with him. The gang members asked Mr. Corley if he was a Crip. Sensing danger, Mr. Corley stood up "which sparked the gang to assault me. Luckily, the Officer left the gate open and I was able to swiftly exit and leave the clinic with minor injuries." Pl. Aff. ¶ oo.

Mr. Corley had another lucky escape from possible gang violence later during his stay in the GVRC. One day, while waiting in the "Dangerzone," an obscure stairwell, out of sight of staff, he was cornered by six Crips, who had learned that he had come from Bloods territory. Fortunately, the incident ended calmly: Mr. Corley was able to convince the gang members that he was not a Blood, and they left him alone. *Id.* at ¶ pp. While he emerged from these two gang-related incidents with minor or no physical injuries, Mr. Corley states that he witnessed a number of other, extreme violent incidents while at GVRC.

The GVRC uses a number of techniques to secure the facility. Mr. Corley complains that several of them are excessive as applied to him, despite the fact that the practices prevailed

throughout the jail, and were not directed at him in particular.  For example, Mr. Corley states that

he was subject to over ten facility-wide lock downs, during which he was confined to his cell for 24

hours a day.  Some of the lock-downs lasted for more than 72 hours, during which time, he could

not leave his cell.  Mr. Corley acknowledges that each of those lock-downs "was for reasons

unrelated to myself or my housing area."  *Id.* ¶ gg.

Similarly, the GVRC systematically locked out inmates three hours late every day, adding to

the amount of time per day that inmates spent confined to their cells.  SAC ¶ 19(o).  According to

Mr. Corley, the practice violated Board of Correction ("BOC") standards.  Mr. Corley suggests that

the reason jail officials follow this practice is "probably . . . to give Officers additional time to do a

daily search of the other housing units," but complains that, in fact, the unit officer is actually

present in the unit during that time, "managing their personal affairs."  Pl. Aff. ¶ jj.

Mr. Corley also asserts that he was scanned by a "SecurPass" x-ray machine more than 30

times during 2012.  Each of those scans exposed him to an unknown amount of radiation and

exhibited his "bodily organs and genitals" to the machine operator and spectators; he asserts no

specific injury from the scans.  Mr. Corley asserts that he was selected for scanning "arbitrarily," and

not on account of suspicion that he harbored contraband.  *Id.* ¶ ii.  He does not allege that he was

targeted for scanning as punishment or retaliation.

Mr. Corley believes that he was, however, the target of significant harassment and retaliation

at the facility.  He states that he experienced over thirty "excessive" cell searches in 2012, which

"were used primarily for harassment due to inmate complaints or disrespect to staff . . . ."  *Id.* ¶ hh.

Mr. Corley states that each search resulted in the disorganization of, or damage to, his legal papers.

While somewhat unclear from the complaint, Mr. Corley appears to assert that *each* of those thirty

searches resulted in a body cavity search.  The complaint describes only one such cell search with

any specificity, however.  In that incident, Captain McQuaid and another unnamed officer searched

his cell to read his legal paperwork.  The unknown officer read selections from Mr. Corley's legal

papers over a walkie-talkie.  Mr. Corley asserts that the search was "retaliation for filing several

grievances and participating in the Inmate Council," but does not explain the causal link that led him

to that conclusion.  SAC ¶ 19(i).  Mr. Corley does not describe any of the specific circumstances of

the other searches, including the body cavity searches, the actors involved, or the basis for his

conclusion that those searches were unreasonable and excessive.

It is clear from the complaint that Mr. Corley filed a number of grievances about conditions

during his time at the GVRC.  Several of his claims in this action derive from officers' inflammatory

responses to prison grievances filed by Mr. Corley.  For example, after Mr. Corley complained about

lack of coffee in his meals, Deputy Warden Texeira stormed into the unit screaming "Corley Corley!

I hear you['re] not getting your coffee, don't worry your [sic] gonna get it, Corley!"  Pl. Aff. ¶ ll.

Unbeknownst to Mr. Corley, the coffee was being stolen by kitchen workers, and Deputy Warden

Texeira's shouted comment about coffee put Mr. Corley in hot water with the thieves, who assumed

that he had snitched on them.  There is no allegation that Deputy Warden Texeira knew what Mr.

Corley did not know at the time—namely, that the kitchen workers were stealing the coffee, and,

therefore, that the Deputy Warden believed that her comments would spark an altercation between

Mr. Corley and other prisoners.

Mr. Corley also claims that Captain Wynn "grew impatient with my multitude of complaints"

and, in retaliation, moved him back to the Annex and away from her supervision.  Pl. Aff. ¶ pp;

SAC ¶ 19(w).  It was there, in the "Dangerzone," where Mr. Corley talked his way out of the

confrontation with a threatening group of Crips.  *Id.*  Mr. Corley does not describe any other adverse

consequences of that move.

Finally, Mr. Corley tried to file a grievance against Ms. Deborah Moultrie, herself an inmate

grievance resolution program supervisor.  After exiting Ms. Moultrie's office, she shouted after him

"you want to complain about me?  Huh, you better worry about what that judge is gonna do to you after what you did to those little girls."  Pl. Aff. ¶ mm.  This comment, overheard by several officers and inmates, resulted in several days of harassment by inmates, who accused Mr. Corley of being a child molester.  It appears that the harassment ended after Mr. Corley was asked by inmates for his paperwork, presumably regarding the true nature of his alleged crime.  The paperwork cleared the misimpression caused by Ms. Moultrie's comment, but "[s]ome inmates still held resentments as they then learned I was a 'Pimp.'"  *Id.*

While at the GVRC, Mr. Corley experienced a religious conversion.  On May 5, 2012, just over three months after his arrival there, Mr. Corley, an African-American man, filed a form to change his religious preference from "None" to "Jewish."  SAC ¶ 23.  On June 26, 2012, Mr. Corley was interviewed by the Jewish Chaplain at the GVRC, Rabbi Richtman.  The Rabbi refused to accept Mr. Corley's change of religion form, stating that "he does not want to mistakenly grant an assumed 'gentile' . . . a 'Jewish Identity'; which could possibly be used fraudulently outside of jail." *Id.*  The Rabbi also refused to provide Mr. Corley with a Torah, Tanakh, or any other religious materials.

After several more conversations with Rabbi Richtman, and a number of grievances and appeals filed by Mr. Corley, eventually, on November 19, 2012, the GVRC director of ministerial services approved Mr. Corley's change of religious preference.  The director told Mr. Corley that he believed that "the hurdles Plaintiff went through to approve the form [were] outrageous . . . ."  *Id.*  He went on to say much more.  As the complaint asserts:

> The Director also mentions that the Rabbi's refusal to grant the form was likely due to racism as the Plaintiff is Black/African-American.  The Director also indicates that the treatment of Black inmates by the Rabbi is an on-going issue . . . .

*Id.*

Mr. Corley finally received a new inmate ID stating that Mr. Corley's religion was "Jewish"

6

on November 30, 2012.  Without the new ID, Mr. Corley was unable to receive kosher meals.

Despite the new ID, however, from December 1 through December 12, 2012, the GVRC continued

to deny Mr. Corley kosher meals, claiming on several occasions that "there are no Kosher meals on

the entire [Rikers] island."  *Id.*  Mr. Corley describes that failure as retaliation for his exercise of his

religious rights.  While it is unclear what Mr. Corley ate or was willing to eat before he received his

new ID card, from December 1 he refused to eat-non-Kosher food.  On several occasions during

that time, Captain Wynn would check with unit officers to see if Mr. Corley was eating, and

instructing that they make a log if he ate a general population meal.  But Mr. Corley held fast, and

fasted.  On December 6, 2012, he was hospitalized due to his refusal to eat non-Kosher meals,

suffering from "dangerous low blood-sugar levels" so severe that he required intravenous revival.

*Id.*  Mr. Corley's detention at the GRVC ended on January 29, 2013 when he was transferred to

federal custody.  *Id.* ¶ 19(x).

## II.      Procedural History

    Mr. Corley commenced this action on April 28, 2014, and has twice since amended his

complaint.  On September 19, 2014, Mr. Corley filed his second amended complaint seeking

declaratory and injunctive relief as well as punitive and compensatory damages.  In the year since he

filed his amended complaint, Mr. Corley has only served the City of New York and Warden

Edmund Duffy; no other named defendants have been served.  The City of New York and Warden

Duffy have moved to dismiss the second amended complaint under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  They argue that Mr. Corley failed to exhaust his administrative remedies,

and that, as a consequence, the complaint must be dismissed as a whole.  They also argue that, with

the exception of his RLUIPA claims, Mr. Corley's complaint fails to state a cause of action.[2]

---

[2]  The City of New York and Warden Duffy move to dismiss claims in Mr. Corley's complaint with respect to which
those defendants are not alleged to have been responsible—principally, Mr. Corley's claims of verbal harassment, refusal
to accept grievances, retaliation, equal protection, slander, and negligence in denying him an adequate kosher diet.

### III.   Standard of Review

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Despite the well-established rule in this circuit that *pro se* submissions are to be liberally construed and interpreted to raise "the strongest arguments they suggest," *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006), the plausibility standard applies equally to *pro se* complaints.  *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

To state a claim for relief that is facially plausible, an allegation must be "more than an unadorned, the-defendant-unlawfully-harmed me accusation"; a claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Accordingly, where a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

In making that determination, the Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks and citation omitted).  On the other hand, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (a court is "'not bound to accept as true a legal conclusion couched as a factual allegation'") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

---

Those Defendants request that the Court act on the motion and afford any relief granted to the named defendants who have not yet been served.  Because the defendants who allegedly committed those violations have not yet been served with the complaint, however, the Court declines to rule on the sufficiency of those allegations at this time.

## IV.    Discussion

The motion to dismiss asserts a number of reasons why the complaint should be dismissed. For organizational purposes, the Court will generally follow the order of presentation adopted by Defendants in their motion.  The Court analyzes each of Defendants' arguments in turn below.

### A.    Exhaustion of Administrative Remedies under the PLRA

Defendants first contend that the entire complaint must be dismissed because Mr. Corley failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e (the "PLRA").  The PLRA requires an inmate to exhaust all available administrative remedies prior to filing suit with respect to prison conditions under 42 U.S.C. § 1983 or any other federal law.  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle,* 534 U.S. 516, 532 (2002).  "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court."  *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011).  Moreover, the plaintiff's exhaustion must be "proper."  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Woodford v. Ngo,* 548 U.S. 81, 90–91 (2006).  The correctional facility's requirements, and not the PLRA "define the boundaries of proper exhaustion."  *Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir. 2009).  In this case, Mr. Corley was required to comply with the DOC's multi-step Inmate Grievance Resolution Program ("IGRP").[3]

---

[3] The Court takes judicial notice of the IGRP's procedures, which are available online.  *See* N.Y. City Dep't of Corr., Directive:  Inmate Grievance Resolution Program, No. 3375R-A (effective date March 8, 2008), available at http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf; N.Y. City Dep't of Corr., Directive:  Inmate Grievance and Request Program, No. 3376 (effective date Sept. 12, 2012), available at http://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Program.pdf; *see also Myers v. City of New York,* No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *4 n. 6 (S.D.N.Y. Aug. 29, 2012) (collecting cases where the court took judicial notice of IGRP procedures).

Failure to exhaust administrative remedies is an affirmative defense under the PLRA. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). "[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Thus, as with other affirmative defenses, dismissal pursuant to Rule 12(b)(6) for failure to exhaust is appropriate only if that failure is apparent from the face of the complaint. *See, e.g., Pierre-Louis v. Martinez*, No. 12 CV 2240 (NGG) (LB), 2014 WL 4161960, at *4 (E.D.N.Y. Aug. 19, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is . . . appropriate only where non-exhaustion is apparent from the face of the plaintiff's complaint."); *Johnakin*, 2013 WL 5519998, at *6 ("Since this Court does not find that 'nonexhaustion is clear from the face of the complaint,' this Court declines to dismiss this action for failure to exhaust administrative remedies at this juncture.) (quoting *McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)).

In this case, Mr. Corley has alleged in his complaint that he "exhausted all administrative remedies" and has described in some detail a number of the particular steps he took to exhaust them. SAC ¶¶ 14-15, 17. Defendants argue that dismissal of the entire complaint pursuant to Rule 12(b)(6) is appropriate because Mr. Corley did not specifically allege that he requested a formal hearing before IGRC for any of his grievances. Defendants also assert that Mr. Corley was required to request appeals to the BOC for three grievances and that he failed to allege that he did so. But, as the Supreme Court established in *Jones*, Mr. Corley was not required to describe all of the steps he took to exhaust his administrative remedies in the complaint. The fact that the complaint describes some of the steps Mr. Corley took to exhaust his remedies does not mean that he failed to take any steps not specifically described in the complaint. For example, a review of the documents attached to the complaint suggests that Mr. Corley requested both a formal hearing before the IGRC and an appeal to the BOC for at least one grievance, even though he failed to specifically mention that he had taken those steps in the complaint. Dkt. No. 2 at 9, 14.

Since failure to exhaust administrative remedies is an affirmative defense, and that defense is not apparent on the face of the complaint, the Court denies Defendants' motion to dismiss on that ground.  Defendants may, of course, assert this defense on a motion for summary judgment.

### B.      Section 1983 Claims

Mr. Corley has asserted a number of claims under 42 U.S.C. § 1983.  "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).  "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)).  "A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights." *Ross v. Westchester Cnty. Jail*, No. 10 Civ. 3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)).  Additionally, where, as here, a plaintiff is seeking money damages against the defendants, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under Section 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).[4]

Mr. Corley's 1983 claims are not neatly parsed or classified by type of claim.  But, liberally construed, Mr. Corley's complaint raises constitutional claims under the Fourteenth, First, and Fourth Amendments.  Mr. Corley alleges that Defendants violated his due process rights and

---

[4] The Court observes that Mr. Corley has asserted multiple Section 1983 claims without specifically alleging which of the defendants was involved in the constitutional deprivation. For example, Mr. Corley does not allege which defendant was responsible for the structural failures in the Inmate Grievance Resolution Program or responsible for certain searches of Mr. Corley's cell.  *See* SAC ¶ 19(j); Pl. Aff. ¶ pp.  Defendants have not specifically briefed the issue of whether any of the plaintiff's claims adequately pleads the personal involvement of any particular defendant—including Warden Duffy. While the Court holds here that some claims survive as to Defendants, the Court does not preclude Defendants from arguing in the future that the complaint does not sufficiently allege the personal involvement of any defendant in any of the alleged violations.

subjected him to unconstitutional conditions of confinement all in violation of the Fourteenth

Amendment.[5]  Mr. Corley alleges that Defendants denied him meaningful access to the courts and

the right to petition the government for redress in violation of the First Amendment.  Mr. Corley

alleges that Defendants subjected him to unreasonable searches in violation of the Fourth

Amendment.

### 1.  Due Process Claims

The plaintiff alleges that he was deprived of his procedural due process rights under the

Fourteenth Amendment.  To succeed on a procedural due process claim, a plaintiff must establish

that (1) he possessed a liberty interest, and (2) defendants deprived him of that interest through

insufficient process.  *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004).  "Liberty interests protected

by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the

laws of the States."  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983), overruled in part by *Sandin v. Conner*,

515 U.S. 472 (1995).  The Court examines each of Mr. Corley's due process claims below with this

general framework in view.

### a.  Transfer to the GRVC

Mr. Corley alleges that his transfer to the GVRC in February 2012 "without notice or

hearing" violated his due process rights.  SAC ¶ 19(c).  According to Mr. Corley, his low security

classification should have prevented him from being transferred from the MDC, which he alleges is

a "medium security facility," to the GRVC, which he alleges is a "maximum security facility."  *Id.* ¶¶

19(a), (e).  Mr. Corley argues that he "has a liberty interest in not being transferred to a maximum

---

[5] When challenging their conditions of confinement, convicted prisoners must prove that the conditions constituted "cruel and unusual punishment" within the meaning of the Eighth Amendment.  Because the Eighth Amendment's protections do not extend to pretrial detainees, who may not be "punished" prior to a conviction, the plaintiff must bring his conditions of confinement claims under the Fourteenth Amendment.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) ("[A] person detained prior to conviction receives protection against mistreatment at the hands of prison officials under . . . the Due Process Clause of the Fourteenth Amendment if held in state custody.").  In the Second Circuit, courts analyze conditions of confinement claims "under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  *Id.* at 72.

security facility without due process."  Plaintiff's Opposition ("Pl. Opp'n"), Dkt. No. 33 ¶ 4(a).  Mr.

Corley also claims that his two transfers within the GVRC—from the Annex to the Odd Side and

back again—also violated his due process rights.  Mr. Corley claims that he believes that his internal

moves within the GVRC were "solely for harassment and retaliation," in response to complaints to

prison officials, but he provides no concrete factual support for that conclusion.  SAC ¶ 19(f); Pl.

Aff. ¶ pp; SAC ¶ 19(w).

Mr. Corley's claims fail because the mere transfer of a pretrial detainee within a prison

population or between prisons does not give rise to a protected liberty interest under the Due

Process Clause.  *Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 129 (2d Cir. 1991) ("'[T]he transfer of

an inmate to less amenable and more restrictive quarters for nonpunitive reasons' is not a right

protected by the due process clause itself.")(quoting *Hewitt*, 459 U.S. at 468)); *see also Butler v.*

*Westchester County*, No. 94 Civ. 8216 (SHS), 2000 WL 335539, at *4 (S.D.N.Y. Mar. 30, 2000) ("Due

process is not implicated when a pretrial detainee is transferred from one facility to another.").

Mr. Corley does not allege any punitive intent behind his transfer to the GRVC.  Mr. Corley

flatly asserts in his opposition that the transfer was made "with the intent to punish Plaintiff . . . ."

Pl. Opp'n ¶ 9(a).  However, the facts pleaded do not support that conclusion; to the contrary, his

pleadings assert that the classification system was arbitrary and that the reason for his transfer to the

GVRC was overcrowding at the MDC.  SAC ¶ 19(c).

Although Mr. Corley claims that his two transfers within the GRVC were intended as

retaliatory, punitive measures, in response to his complaints, his conclusory assertions about the

purpose of those transfers are not supported by factual allegations.  The Second Circuit has

cautioned that "courts must approach prisoner claims of retaliation with skepticism and particular

care . . ." in part because "virtually any adverse action taken against a prisoner by a prison official—

even those otherwise not rising to the level of a constitutional violation—can be characterized as a

constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001),

overruled on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Thus, in order to

survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims

must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took

adverse action against the plaintiff, and (3) that there was a causal connection between the protected

speech and the adverse action." *Dawes*, 239 F.3d at 492. The Second Circuit requires that such

claims be "supported by specific and detailed factual allegations," not stated "in wholly conclusory

terms." *Dolan v. Connolly*, ---F.3d---, No. 14 Civ. 2561, 2015 WL 4477342, at *3 (2d Cir. July 23,

2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), overruled on other grounds by

*Swierkiewicz*, 534 U.S. at 506). Mr. Corley's allegations regarding his transfer within the GVRC do

not meet this standard. Indeed, Mr. Corley pleads that his transfer to the Odd-side was for

"undisclosed reasons," and he offers only speculation that the transfers were implemented as

punitive retribution for his active participation in the jail's grievance program.

     The Court next considers whether Mr. Corley raises a state-created liberty interest actionable

under the Fourteenth Amendment. States may confer liberty interests on prisoners through statues

or regulations. *See Arce v. Walker*, 139 F.3d 329, 334 (2d Cir. 1998). Courts have found that New

York laws and regulations give prison officials broad discretion to transfer pretrial detainees between

facilities regardless of administrative classifications. *See, e.g., Cooper v. City of New York*, No. 13 Civ.

7590 (PKC) (JLC), 2014 WL 5315074, at *4 (S.D.N.Y. Oct. 17, 2014)( "Judges of this District have

analyzed relevant New York statutes and regulations and determined that they do not give rise to a

protectable liberty interest regarding the administrative classification of inmates."); *Caldwell v. Dep't of

Corr. for City of New York*, No. 14 CV 5551 (JSARL), 2015 WL 428033, at *5 (E.D.N.Y. Jan. 30,

2015)(collecting cases); *Rosario v. Fischer*, No. 11 Civ. 4617 (JPO) (FM), 2012 WL 4044901, at *11

(S.D.N.Y. Aug. 28, 2012) report and recommendation adopted, No. 11 Civ. 4617 (JPO), 2012 WL

6681695 (S.D.N.Y. Dec. 20, 2012)(finding that the applicable laws and regulations do not create a liberty interest against transfer "since New York State regulations do not substantively restrict prison officials' authority to transfer pretrial detainees").  Mr. Corley has not identified any state law or rule that would cause the Court to deviate from this well-established line of precedent.  Because Mr. Corley does not have a liberty interest in his transfer to the GRVC or transfers within the GRVC, his due process claims with respect to those transfers must be dismissed.

     **b.**  **Access to Inmate Grievance Resolution Program**

   Mr. Corley alleges that the "GRVC grievance program was not following DOC policy" by failing to properly elect inmates for the IGRC.  SAC ¶ 19(j).  According to Mr. Corley, the GRVC's grievance program "used the vacant inmate votes to deny hearings and grievances arbitrarily, and to make the program biased towards staff."  *Id.*  Mr. Corley alleges that those problems with the IGRP violated his First Amendment rights.  *Id.* ¶ 24(a).  Liberally construed, Mr. Corley's allegations could be understood to raise an additional due process violation.

   With respect to any due process claim, Mr. Corley did not have a constitutionally protected liberty interest to access the GRVC's grievance program.  *See Mimms v. Carr*, No. 09 CV 5740 (NGG) (LB), 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) aff'd, 548 F. App'x 29 (2d Cir. 2013)("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest."); *Torres v. Mazzuca,* 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.").  "The First Amendment guarantees meaningful access to the courts and the right to petition the government for redress.  The First Amendment is not implicated, however, where prison officials deny an inmate access to grievance procedures."  *Mimms,* 2011 WL 2360059, at *10 (internal citation omitted).  Thus, the GRVC's alleged failure to follow

DOC's IGRP requirements does not state a claim for a violation of Mr. Corley's due process or First Amendment rights.  Those claims are dismissed.

### c.        Destruction of Personal Property

Mr. Corley alleges that at various times his personal property, including his legal papers, was destroyed or confiscated when prison officials searched his cell.  Pl. Aff. ¶ hh; SAC ¶ 23(k). Defendants argue that Mr. Corley's allegations concerning the destruction or confiscation of his property do not state a due process claim because Mr. Corley had opportunities for redress through state law.  The Court agrees with defendants with respect to the plaintiff's personal property other than his legal papers.  "Whether negligent or deliberate, the destruction of an inmate's property caused by a prison officer's unauthorized conduct does not give rise to a claim under the Due Process Clause if the state provides that inmate with an adequate postdeprivation remedy." *Toliver v. City of New York*, No. 10 Civ. 5806 (SHS) (JCF), 2013 WL 6476791, at *7 (S.D.N.Y. Dec. 10, 2013) report and recommendation adopted, No. 10 Civ. 5806 (SHS), 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014) (citing *Hudson v. Palmer*, 468 U.S. 517, 533–36 (1984)).  "It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing through state law causes of action for 'negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss.'" *Id.* (quoting *Cook v. City of New York*, 607 F .Supp. 702, 704 (S.D.N.Y. 1985)).  Mr. Corley does not claim that he was denied adequate postdeprivation procedures by which to seek compensation for the destruction of his property.  As a result, he has not stated a due process claim for the loss of his property.

On the other hand, Mr. Corley's allegations regarding the destruction of his legal papers in particular could implicate his constitutional right to access the courts under the First Amendment. *Willey v. Kirkpatrick*,---F.3d---, No. 13-699, 2015 WL 5059377, at *16 (2d Cir. Aug. 28, 2015) ("Legal documents have characteristics that differentiate them from mere 'property' whose destruction can

be adequately remedied by a generic property-deprivation state law.  Their theft or destruction, for example, may irrevocably hinder a prisoner's efforts to vindicate legal rights.").  "[P]risoners have a constitutional right of access to the courts, which is infringed when prison officials interfere with a prisoner's preparation of legal documents."  *Thomas v. Egan*, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing *Lewis v. Casey*, 518 U.S. 343, 350 (1996)).  The complaint alleges sufficient facts regarding interference with his legal papers to survive Defendants' motion to dismiss.

In sum, all of Mr. Corley's due process claims and corresponding First Amendment claims discussed above are dismissed, with the exception of his claims regarding the alleged damage to his legal documents.

### 2.   Conditions of Confinement

To state a claim based on conditions of confinement, "an inmate must allege that:  (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety.'" *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).  "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."  *Id.* (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981), and *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).  "To meet the subjective element, the inmate must show that the defendant acted with 'more than mere negligence.'"  *Walker*, 717 F.3d at 125 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  To constitute deliberate indifference, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety."  *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012).

a.      **Radiation Exposure from SecurPass scans**

Mr. Corley alleges that the defendants used a "SecurPass" full-body X-ray machine to subject him to over thirty "arbitrary body scans." Pl. Aff. ¶ ii. He alleges that the scans exposed him to "unknown levels of radiation." *Id.* Defendants argue that Mr. Corley's allegations do not satisfy the objective test of a conditions of confinement claim because the SecurPass radiation exposure did not pose an unreasonable risk of serious damage to Mr. Corley's health. To support their contention, Defendants cited to the factual findings made by Judge Seibel when she considered a similar X-ray radiation claim raised by a different Rikers' inmate. *See In re RadPro SecurPass Scanner Cases,* No. 13 Civ. 6095 (CS), 2014 WL 4054310 (S.D.N.Y. Aug. 13, 2014). Judge Seibel dismissed the inmate's conditions of confinement claim finding that "[e]ven at its highest setting, the SecurPass . . . emits less radiation than one receives during a two-hour flight or a day-and-a-half of ordinary living. Furthermore, the radiation dose emitted in a single SecurPass scan is one-twenty-fourth of the dose in a single mammogram." *Id.* at 7. The Court need not rely on Judge Seibel's factual findings to reach a determination on this issue because Mr. Corley has clearly failed to meet the subjective element of this claim. To satisfy the subjective element of a conditions of confinement claim, Mr. Corley was required to allege that Defendants submitted him to these scans knowing that they posed an excessive risk to his health. Mr. Corley has made no such allegation. Mr. Corley does not allege that Defendants knew, or even believed, that SecurPass radiation posed any risk to his health. Accordingly, Mr. Corley's SecurPass-related claims are dismissed.

b.      **Lock-out Practices**

Mr. Corley alleges that prison officials systematically locked out inmates late each day, resulting in inmates spending three additional hours confined in their cell, allegedly in violation of the "Minimum Standards Guidelines" set forth by the BOC. SAC ¶ 19(o). As an initial matter, the Court observes that conditions that are in conflict with the Minimum Standard Guidelines are not

automatically deemed to be violations of constitutional rights. *Johnakin v. NYC Dep't of Corr.*, No. 11 CV 4807 (SLT) (LB), 2013 WL 5519998, at *11 (E.D.N.Y. Sept. 30, 2013) ("[A]llegations of a violation of the Minimum Standards, which reflect the New York City Board of Correction's views of 'the basic elements necessary to promote safe, secure and humane jail environments,' . . . do not make out a violation of constitutional rights or federal law.").

More importantly, Mr. Corley does not allege how the GRVC's lock-out practice imposed unreasonable risks to his health or safety. Mr. Corley's allegation that he was confined to his cell for three additional hours each day, by itself, is insufficient to rise to a level of a constitutional violation. *See, e.g., U. S. ex rel. Walker v. Mancusi*, 467 F.2d 51, 53 (2d Cir. 1972) (finding that appellants confined to their cells except for a short exercise period each day did not have an Eighth Amendment claim); *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 214 (N.D.N.Y. 2001) (finding that plaintiff's twenty-four hour cell confinement for six months did not violate the Eighth Amendment). With reference to Defendants' state of mind, Mr. Corley has not alleged that Defendants submitted him to the lock-out practices knowing that the practices posed an excessive risk to his health or safety. Accordingly, Mr. Corley's claims related to the GRVC's lock-out practices are dismissed.

### c.    Other Allegations Regarding Conditions of Confinement

The complaint details a number of other conditions at the GRVC that Mr. Corley found objectionable. To the extent that Mr. Corley attempts to raise a conditions of confinement claim based on those other allegations, his claims fail. Specifically, Mr. Corley alleges that the GRVC staff confined him to his cell for up to 72 hours during full-facility lock-downs. According to the complaint, these lock-downs were implemented facility-wide, and were not targeted at Mr. Corley. Pl. Aff. ¶ gg. Mr. Corley's allegations do not meet the objective test because he failed to allege that the lock-downs posed an unreasonable risk of serious damage to his health or safety. The

allegations also fail to meet the subjective test because Mr. Corley has not alleged that Defendants instituted the lock-downs despite their knowledge of an excessive risk to his health or safety.

Mr. Corley also alleges that the GRVC staff provided inmates in the detention center too few chairs and tables.  He also claims that prison officials, intimidated by the gangs, allowed gang members to monopolize the use of the GRVC's kitchen, telephone, and television.  *Id.* at ¶ rr. The Second Circuit has observed that "[b]ecause society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).  Mr. Corley's allegations fail to meet the objective test because these minor inconveniences, while potentially uncomfortable, could not have posed an unreasonable risk of serious damage to Mr. Corley's health or safety.  As a result, no defendant is plausibly alleged to have subjected Mr. Corley to those inconveniences with the knowledge that they would be endangering his health or safety.

Finally, Mr. Corley alleges that Defendants failed to assign "suicide prevention aides" to his particular housing unit.  According to Mr. Corley, suicide prevention aides are inmates who "keep the housing unit safe by alerting staff of inmates with suicidal tendencies and those likely to act out violently due to sudden events (e.g. bad phone call, visit or legal problem)." *Id.* at ¶ kk.  Mr. Corley does not allege that he suffered any injury as a result of the lack of suicide prevention aides, or that he himself was ever suicidal, and thus could have benefitted from the assistance of those aides.  Mr. Corley's allegations do not meet the objective test because he failed to allege that a lack of suicide prevention aides posed an unreasonable risk of serious damage to his health or safety.  The allegations also fail to meet the subjective test because Mr. Corley has not alleged that Defendants knowingly placed Mr. Corley's health or safety in danger by deciding not to place a suicide prevention aide in his housing unit.

### d.       Failure to Protect

Under the Eighth Amendment, "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988)). Despite this general requirement to protect inmates, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. In *Farmer*, the Supreme Court established a two-pronged test to evaluate whether a prison official has violated the Constitution through his failure to prevent harm to an inmate. First, the prisoner must have been "incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the prison official must have shown "deliberate indifference" to the prisoner's safety. *Id.* The test for deliberate indifference has two requirements: To act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes*, 84 F.3d at 620 ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." (citing *Farmer*, 511 U.S. at 847)).

Mr. Corley alleges that he was subjected to a "hostile environment" in the GRVC because of its large population of "violent street gang members and high-classification inmates." SAC ¶ 31(d); Pl. Aff. ¶ aa. Mr. Corley alleges that he had two threatening encounters with inmates who were gang members and in one incident he suffered "minor injuries." *Id.* ¶¶ oo-pp. Mr. Corley also alleges that throughout his entire stay at the GRVC he "witnessed several extreme violent incidents: gang assaults, slashings, riots and bloody fights." *Id.* ¶ qq. Mr. Corley further argues that Defendants exhibited:

> deliberate indifference to the safety of low-classification, non-violent, non-[Security Risk Group] status inmates and created a hostile living environment below any

applicable standard of care.  […]  This deliberate indifference comes from knowing the GRVC is designed to combat violence and gangs, then disregarding that non-gang members ('neutrals') will face oppression from these gangs.  Also knowing Plaintiff to be particularly vulnerable due to the nature of his criminal charges (sexual offense against minor).

*Id.* ¶ 4(b).

In sum, Mr. Corley alleges that the GRVC's rampant gang violence endangered inmates like himself who were not members of gangs.  According to the plaintiff, prison officials knew of this violence and should have done something more to keep him safe.  Mr. Corley's complaint does not satisfy the second prong of the *Farmer* test.  He has not alleged sufficient facts to allow the Court to infer that GRVC prison officials knew of and disregarded a "substantial risk of serious harm" to the plaintiff.  *Farmer*, 511 U.S. at 834.  The violence that Mr. Corley describes in his complaint is unfortunately the routine type of violence found in many maximum-security prisons.  *See Jones v. Goord*, 190 F.R.D. 103, 108 (S.D.N.Y. 1999) ("Although no court approves of physical violence in the correctional system, the fact is that maximum security prisons house violent offenders, and confrontations between inmates are, to some extent, inevitable despite the best efforts of correction officers and prison officials to prevent them.  Such incidents, standing alone, do not necessarily rise to the level of cruel and unusual punishment.  Nor will 'fear of assault' by other inmates support a constitutional claim.").

To meet the subjective element of the *Farmer* test, Mr. Corley needed to allege facts beyond the occurrence of general prison violence and sporadic verbal confrontations resulting in minor or no injuries.  *See Melo v. Combes*, No. 97 Civ. 0204 (JGK), 1998 WL 67667, at *5 (S.D.N.Y. Feb. 18, 1998) (dismissing failure to protect claim that relied on "issues of prison safety in the most general sense.").  The complaint does not allege a single incident where GRVC prison officials should have acted to protect the plaintiff or other inmates and deliberately failed to do so.  *See Warren v. Goord,* 476 F. Supp. 2d 407, 410–13 (S.D.N.Y. 2007) (plaintiff stated a failure to protect claim when he

alleged that defendants knew about assaults and stabbings that regularly took place in the yard, knew that an inmate had been killed in the yard, knew that weapons were stored in the yard, knew that the use of metal detectors would prevent such attacks from taking place, but failed to use metal detectors).  The only two specific gang-related incidents that the plaintiff details in his complaint are insufficient to state a claim.  In the first, the prison officer "accidentally" placed Mr. Corley in a holding pen with five Blood members.  Pl. Aff. ¶ oo.  In the other, Mr. Corley had an encounter with six Crips while he was out of sight of prison officials—and that encounter resulted in no physical injury to, or even contact with Mr. Corley.  Neither incident supports an inference that prison officials at the GRVC were deliberately indifferent to Mr. Corley's safety.  Accordingly, Mr. Corley's failure to protect claim is dismissed.

In sum, all of Mr. Corley's conditions of confinement claims discussed above are dismissed.

### 3.    Unreasonable Searches

"The fourth amendment prohibits only unreasonable searches; therefore, the test in a fourth amendment case is whether the search was reasonable.  To determine reasonableness, the court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests."  *Sec. and Law Enforcement Employees v. Carey*, 737 F.2d 187, 201 (2d Cir. 1984).  "The test of reasonableness under the Fourth Amendment . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  In *Hudson*, the Supreme Court held that prison officials may search prisoners' cells without violating the Fourth Amendment because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions."  *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).

The Second Circuit has subsequently held "that inmates do retain a limited right to bodily privacy" under the Fourth Amendment. *Covino v. Patrissi*, 967 F.3d 73, 77 (2d Cir. 1992). The Second Circuit has also observed that within their cells "pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment . . . ." *United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988). *See, e.g., United States v. Cohen,* 796 F.2d 20, 24 (2d Cir. 1988) (pretrial detainee retained sufficient expectation of privacy within his cell to challenge search ordered by the prosecutor for investigatory rather than institutional security related reasons).

Mr. Corley alleges that he "experienced over thirty (30) excessive cell searches in 2012. These searches were used primarily for harassment due to inmate complaints or disrespect to staff from isolated incidents. Each search resulted in my legal papers being damaged or disorganized, the loss of various commissary items and a 'Body Cavity Search.'" Pl. Aff. ¶ hh.

Mr. Corley has failed to state a claim that all of these thirty cell searches violated the Fourth Amendment. Prison officials routinely perform cell searches and body cavity searches for institutional security purposes. The Court cannot ignore that integral part of prison life when evaluating Mr. Corley's Fourth Amendment claims. *See Willoughby*, 860 F.2d at 21 ("Given the difficulties inherent in prison administration, prison administrators are to be 'accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' Accordingly, whatever Fourth Amendment rights pretrial detainees retain have been held uninfringed by such security measures as strip and body-cavity searches . . . .") (quoting *Bell*, 441 U.S. at 546).

Mr. Corley has not alleged facts that suggest that the 30 cell searches were unreasonable in light of his status as a pretrial detainee. Although Mr. Corley asserts that these searches were "excessive" or done "primarily for harassment due to inmate complaints or disrespect to staff from isolated incidents," with the exception of two searches discussed below, he has failed to support

these conclusory statements with any factual allegations about the particular circumstances of these searches, including the body cavity searches, that render them unreasonable.  He offers only his conclusion that they were "excessive" and imprecise attributions of motive to prison officials.  Pl. Aff. ¶ hh.  Mr. Corley does not describe any of the specific circumstances of the searches, the actors involved, or the basis for his conclusion that those searches were unreasonable and excessive. Without more detailed factual allegations about the nature of those searches and why Mr. Corley understood them to be excessive under the circumstances and/or retaliatory, Mr. Corley does not state a claim that the searches were in violation of the Fourth Amendment.

Mr. Corley does provide additional details about searches conducted on September 8, 2012 and December 6, 2012.  On September 8, 2012, Mr. Corley alleges that he was retaliated against by Captain McQuade and John Doe No. 1 for filing several grievances and participating in the Inmate Council.  Mr. Corley alleges that during a unit search, defendants searched his cell, including legal paperwork, and "read select legal notes over a cell phone and through a walkie-talkie."  SAC ¶ 19(i). Mr. Corley has not alleged sufficient facts to support an inference that the September 8, 2012 search was an unreasonable violation of the plaintiff's right to privacy in his cell.  Mr. Corley's bald assertion that the search was done for retaliatory purposes is unsupported by factual allegations. Moreover, Mr. Corley alleges that that search took place as part of a unit-wide search, which suggests that the search was done at least in part to advance legitimate institutional security interests.

On December 6, 2012, Mr. Corley alleges that he was hospitalized due to his refusal to eat non-Kosher meals, suffering from "dangerous low blood-sugar levels" so severe that he required intravenous revival at the hospital.  *Id.* ¶ 19(k).  Mr. Corley alleges that he when he returned from the hospital; his cell was "ransacked in retaliation for seeking medical attention."  *Id.*  Mr. Corley does not allege who ransacked his cell and why he believes the search was done for retaliatory purposes. As a result, Mr. Corley has not alleged sufficient facts to support an inference that the December 6,

2012 search was an unreasonable violation of his right to privacy in his cell.  Accordingly, Mr.

Corley's unreasonable searches claims are dismissed

### C.    Physical Injury

Defendants argue that because Mr. Corley has alleged only *de minimis* physical injuries the

PLRA precludes him from receiving compensatory damages.  Under Section 1997e(e) of the PLRA,

"[n]o Federal civil action may be brought by a prisoner confined in a jail, prison or other

correctional facility, for mental or emotional injury suffered while in custody without a prior

showing of physical injury."  42 U.S.C. § 1997e(e); *see also Thompson v. Carter*, 284 F.3d 411, 417 (2d

Cir. 2002) (" . . . Section 1997e(e) applies to claims in which a plaintiff alleges constitutional

violations so that the plaintiff cannot recover damages for mental or emotional injury for a

constitutional violation in the absence of a showing of actual physical injury.").  The purpose of the

PLRA's physical injury requirement is "to weed out frivolous claims where only emotional injuries

are alleged."  *Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002) aff'd, 56 F. App'x 43 (2d Cir.

2003).  In order to recover compensatory damages, a plaintiff must allege that he or she has suffered

a physical injury.

Although the PLRA does not define "physical injury," some courts have held that the

alleged injury must be "more than *de minimis*, but need not be significant."  *Siglar v. Hightower*, 112

F.3d 191, 193 (5th Cir. 1997); *Gilmore v. Rivera*, No. 13 Civ. 6955 (RWS), 2014 WL 1998227, at *7

(S.D.N.Y. May 14, 2014) ("The physical injury complained of must be more than a *de minimis* one.");

*see also Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999) (citing *Siglar* and concluding that the

prisoner's allegations of "sexual assaults would constitute more than *de minimis* injury if they

occurred.").  Mr. Corley has met this standard with respect to at least some of his allegations.  Mr.

Corley alleges that "[on] December 6, 2012, [he] was hospitalized due to refusal to eat non-Kosher

meals and not being provided with an adequate substitute.  This starvation resulted in [him] being

hospitalized for 'dangerous[ly] low blood-sugar levels' and required intravenous revival."  SAC ¶ 23(k); *see also* Dkt. No. 2 at 29, Harassment Grievance dated December 10, 2012 ("The medical staff stated my blood-sugar was very low due to lack of eating and put me on an IV that revive[d] me to stability.").  Taking these allegations as true, Mr. Corley's physical condition required medical attention and the administration of intravenous therapy, which is sufficient to establish that his injury was more than a *de minimis* one.  *C.f.  Alexander v. Tippah Cnty., Miss.*, 351 F.3d 626, 631 (5th Cir. 2003) (finding inmate's allegations of nausea *de minimis* in part because the nausea was not severe enough to warrant medical attention).  Mr. Corley also asserted that he suffered some physical injury in his first altercation with a gang.  Accordingly, Mr. Corley's requests for compensatory damages, as a category of damages with respect to all claims under the complaint, cannot be dismissed as requested by Defendants.

### D.      Municipal Liability Under Section 1983

The City of New York also moves to dismiss all of Mr. Corley's Section 1983 claims on the ground that it may only be held accountable if a municipal "custom or policy" caused the deprivation of Mr. Corley's rights.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)(holding that "this case unquestionably involves official policy as the moving force of the constitutional violation").  To state a claim against the City of New York, a plaintiff must both "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" and "demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  *Bd. of Cnty. Comm'rs of Bryan Cnty., OK v. Brown*, 520 U.S. 397, 403-04 (1997).

Mr. Corley's complaint is devoid of factual allegations about liability on the part of the City of New York.  Mr. Corley's allegations regarding municipal liability consist entirely of "labels and conclusions" or "formulaic recitation[s]" of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  For example, Mr. Corley alleges that Defendants have

"[d]eveloped, promoted, implemented and enforced a practice, policy and custom of: . . . Housing non-violent, discipline-free, low-classification pre-trial detainees in a maximum security facility without due process . . . ." SAC ¶ 31(a). These boilerplate recitations of the elements of municipal liability, without any factual allegations, are wholly insufficient to state a claim of liability on the part of the City of New York for a claim under Section 1983. Mr. Corley thus fails to allege adequately that the City of New York bears any responsibility for the alleged constitutional violations. All of Mr. Corley's Section 1983 claims are dismissed against the City of New York.

### E.  State Law Claims

Defendants argue that Mr. Corley has failed to allege properly cognizable state law tort claims. Mr. Corley summarily lists five state law tort claims in his complaint: (i) "racial and religious discrimination," (ii) abuse of process, (iii) negligent infliction of emotional distress, (iv) slander, and (v) negligence and gross negligence. SAC ¶ 28. In his opposition, Mr. Corley clarifies that his slander claim is asserted only against Deborah Moultrie, the supervisor of the Inmate Grievance Resolution Program, and not against the only two Defendants who have been served in this action. Pl. Opp'n ¶ 9(c). In his opposition, Mr. Corley asserts that one of his negligence claims is against the City of New York, Warden Duffy and John Doe No. 2, the GRVC's Food Services Captain, for their failure to provide him with an adequate religious diet. The complaint does not specifically allege that the City or Warden Duffy were involved in denying Mr. Corley kosher meals. Ms. Moultrie and John Doe No. 2 have not yet been served with the summons and complaint. Accordingly, the Court will not consider the sufficiency of Mr. Corley's allegations of slander and negligent denial of kosher food at this time. As for the other torts, the Court will consider them in turn.

### a.  "Racial and religious discrimination"

Defendants correctly argue that the tort of "racial and religious discrimination" does not exist under New York law.  Defendants' Reply ("Defs.' Reply"), Dkt. No. 34 at 8.  While there are New York State and New York City antidiscrimination laws in the employment context, for example, there is no tort of the kind described by Mr. Corley.  The Court dismisses this claim.

### b.      Abuse of Process

Under New York law, "'a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'"  *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)).

Mr. Corley argues that the City of New York, working through DOC, engaged in abuse of process by transferring him to the custody of Warden Duffy in order to punish him.  Pl. Opp'n ¶ 9(a).  Defendants argue that Mr. Corley has failed to allege that the City used Mr. Corley's transfer to obtain a "collateral objective."  Defs.' Reply at 7.  The Court agrees.  "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution.  Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."  *See Savino*, 331 F.3d at 77.  Mr. Corley has made no such allegation.  Mr. Corley's conclusory assertion that City had an ulterior motive for the transfer—to punish him—is insufficient to state an abuse of process claim.  *See Hauser v. Bartow*, 7 N.E.2d 268, 269 (N.Y. 1937) ("It is not enough that the actor have an ulterior motive in using the process of the court.  It must further appear that he did something in the use of the process outside of the purpose for which it was intended.  Everyone has a right to use the machinery of the law, and bad motive does not defeat that right.  There must be a further act

done outside the use of the process—a perversion of the process.") (citations omitted).
Accordingly, the Court dismisses Mr. Corley's abuse of process claim.

### c.     Negligent Infliction of Emotional Distress

"Under New York law, a claim for intentional infliction of emotional distress requires a
showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a
substantial probability of causing, severe emotional distress; (3) a causal connection between the
conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d
Cir. 1999). The "requirements of the [claim] are rigorous, and difficult to satisfy." *Howell v. New
York Post Co.,* 612 N.E.2d 699, 702 (N.Y. 1993) (citations omitted). A claim of negligent infliction of
emotional distress can only be sustained if the allegations of conduct are "so extreme in degree and
outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as
atrocious and utterly intolerable in a civilized community." *Wilson v. City of New York*, 743 N.Y.S.2d
30, 34 (N.Y. App. Div. 2002) (citations omitted).

Mr. Corley broadly contends that the City of New York, Warden Duffy, Ms. Moultrie,
Captain Wynn, Deputy Warden Texeira, and John Doe No. 2 each engaged in "extreme and
outrageous conduct relative to their official obligations; whose negligence caused Plaintiff's physical
injuries; severe emotional distress and fear for his own safety." Pl. Opp'n ¶ 9(b). Contrary to Mr.
Corley's conclusory assertions, none of the allegations in the complaint rise to the level required for
this cause of action. While some of the treatment that Mr. Corley has alleged is troubling—
particularly those related to the exercise of his religious rights, which are not addressed here because
the relevant defendants have not yet been served—none of it can be considered "utterly intolerable
in a civilized community." *Wilson*, 743 N.Y.S.2d at 34. Accordingly, Mr. Corley's negligent infliction
of emotional distress claims are dismissed.

### d.     Negligence and Gross Negligence

"To prevail on a negligence claim under New York law, a plaintiff must show '[1] a duty on the part of the defendant; [2] a breach of that duty by conduct involving an unreasonable risk of harm; [3] damages suffered by the plaintiff, and [4] causation, both in fact and proximate, between the breach and the plaintiff's harm.'" *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 725 F.3d 65, 117 (2d Cir. 2013) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 161 (2d Cir. 1997)).

Mr. Corley argues that the City of New York and Warden Duffy had a duty to protect him from gang violence, and when they failed to do so, he sustained physical injuries and emotional distress.  Pl. Aff. ¶¶ nn-rr.  Defendants do not dispute the existence of a duty to protect Mr. Corley; nor, for purposes of the motion, do they argue that they did not breach that duty.  Instead, Defendants rely exclusively on the argument that Mr. Corley fails to allege causation adequately. Defs.' Reply at 8.  While it is a close question, the Court disagrees with Defendants.

Proximate causation is a legal concept that means "that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point." *Ventricelli v. Kinney Sys. Rent A Car, Inc.*, 383 N.E.2d 1149 (N.Y. 1978) (quoting *Palsgraf v. Long Is. R.R. Co.*, 162 N.E. 99, 103 (N.Y. 1928)).  In analyzing this question, as relevant here, courts look to whether the accident or injury in question "was within the reasonably foreseeable risks." *Di Ponzio*, 679 N.E.2d at 618.  "[A]lthough virtually every untoward consequence can theoretically be foreseen with the wisdom born of the event, the law draws a line between remote possibilities and those that are reasonably foreseeable because no person can be expected to guard against harm from events which are so unlikely to occur that the risk would commonly be disregarded." *Id.* at 619 (citations, quotations, and alterations omitted).

In this case, Mr. Corley's alleged physical and emotional injuries are a result of intervening acts—physical violence committed by other inmates.  "[L]iability turns upon whether the intervening

31

act is a normal or foreseeable consequence of the situation created by the defendant's negligence." *Derdiarian,* 414 N.E.2d at 670.  In cases that involve unforeseeable, independent or far removed acts "which operate upon but do not flow from the original negligence," such intervening acts may be held to break the chain of causation as a matter of law. *Id.*

The question of proximate cause is typically a question for the finder of fact.  While the acts of other inmates are intervening acts, the Court cannot conclude on this record as a matter of law that the prospect of inmate violence was *not* foreseeable to the defendants.  For that reason, the claim survives the motion to dismiss.

In sum, Mr. Corley's claims for "racial and religious discrimination," abuse of process, and negligent infliction of emotional distress are dismissed.  His negligence and gross negligence claims relating to Defendants' alleged duty to protect Mr. Corley from gang violence survive the motion.

## V.      Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  As set forth above, the plaintiff's Section 1983 claims implicating the Due Process Clause, the First Amendment, conditions of confinement, and unreasonable searches, are dismissed, except with respect to claims related to damage to his legal documents.  With respect to his state law claims, the plaintiff's "racial and religious discrimination," abuse of process, and negligent infliction of emotional distress claims are dismissed.  His claims of negligence survive the motion to dismiss.  All of the plaintiff's Section 1983 claims are dismissed against the City of New York.

The plaintiff is granted leave to file a third amended complaint to cure these defects within forty-five days from the date of this order.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.

*See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is instructed to terminate the motion pending at docket number 27.


SO ORDERED.

Dated:  September 30, 2015
        New York, New York

_____
GREGORY H. WOODS
United States District Judge