UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROYCE CORLEY,

                              Plaintiff,

-against-

EDMUND DUFFY, DORA B. SCHRIRO, DEBORAH MOULTRIE,
RABBI RICHTMAN, CAPTAIN WYNN, CAPTAIN MCQUADE,
CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS,
CAPTAIN DARNLEY PROVERBS, DEPUTY WARDEN TEXEIRA
and SCOTT THOMPSON, in their individual and official
capacity as employees of the CITY OF NEW YORK;

                              Defendants.

THIRD AMENDED COMPLAINT
(Fed. R. Civ. P. 15(c)(1)(B))

14 Civ. 3202 (GHW)

JURY DEMANDED

RECEIVED
SDNY PRO SE OFFICE
2016 MAY 23  AM 11:52

---

## JURISDICTION AND VENUE

1. This action arises under: the U.S. Constitution, particularly under the First, Fifth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983; the Religious Land Use and Institutionalized Persons Act ("RLUIPA"); and New York law; from which this Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3); and supplemental jurisdiction over all other claims, as they form part of the same case or controversy pursuant to 28 U.S.C. § 1367.

2. Venue is proper because a substantial part of the acts occurred within Bronx and New York Counties.

## PARTIES

3. Plaintiff ROYCE CORLEY, acting pro se, is a federal prisoner confined at the Federal Correctional Institution in Danbury, CT. At the time of the controversies asserted in this action, Plaintiff was a pre-trial detainee confined at the Manhattan Detention Complex ("MDC") from January 26, 2012, then transferred to the George R. Vierno Center ("GRVC") on February 2, 2012, until discharged to federal custody on January 29, 2013.

4. Defendant EDMUND DUFFY was the Warden and DEPUTY WARDEN TEXEIRA was the Deputy Warden of the GRVC at all relevant times.

5. Defendant DORA B. SCHRIRO was the Commissioner of the N.Y.C. Department of Correction ("DOC") at all relevant times.

6. Defendant DEBORAH MOULTRIE was the Inmate Grievance Resolution Committee ("IGRC") Supervisor for the GRVC at all relevant times.

7. Defendant RABBI RICHTMAN was the Jewish Chaplain for the GRVC at all relevant times.

8. Defendants CAPTAIN WYNN and CAPTAIN MCQUADE were Captains assigned to supervise housing unit officers in the GRVC at all relevant times.

9. Defendants CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS and CAPTAIN DARNLEY PROVERBS were Captains assigned to supervise the Food Services Department in the GRVC at all relevant times.

1

10. Defendant SCOTT THOMPSON was an "Intelligence Officer" assigned to the Central Intelligence Bureau working on behalf of the Department of Correction at all relevant times.

11. Defendant CITY OF NEW YORK is a municipal corporation organized under the laws of the State of New York and liable under Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978).

GENERAL ALLEGATIONS

A. Case Background:

12. By order dated September 30, 2015, the Court granted leave to file a third amended complaint.

13. This third amended complaint relates back to the April 28, 2014 filing of the original complaint (Dkt. #2), because it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading" Fed. R. Civ. P. 15(c)(1)(B).

14. Plaintiff exhausted all available administrative remedies and complied with all prerequisites to a suit under the Civil Rights Act, RLUIPA and New York law.

B. Atypical Confinement:

15. On January 26, 2012, Plaintiff entering DOC custody, on Promoting Prostitution charges, was housed at the MDC--a medium security facility. The next day, Plaintiff's "Inmate Classification" was calculated to be a five (5), which is in the lowest security category.

16. On February 2, 2012, Plaintiff was transferred without notice or a hearing to the GRVC--a maximum security facility--also known as "The Beacon" due to its highest level of security in the DOC system.

17. There are several characteristics of the GRVC which was common knowledge to all high-ranking DOC officials (Captain and above), GRVC employees and most inmates, i.e.:

a. GRVC was designed for housing the most violent high-classification inmates, Security Risk Groups ("SRG" or gangs), Closely Monitored Custody ("CMC"), Segregation Units ("Bings"), Mental Health Units ("730s") and other special status inmates.

b. Inmates are sectioned into three major parts of the building: Odd-side, Even-side and the Annex. Odd-side and Even-side were concentrated with mostly "Bloods" gang members and other affiliated groups. The Annex was concentrated with "Crips" gang members and other non-rival groups. Non-gang members ("neutrals") are sprinkled-in with all other groups based on "Classification."

c. Despite the Classification System (High, Medium and Low), inmates of all categories share recreation, law library, programs, clinic, commissary, visits, chapel, etc. Segregation only exists between housing units associated with rival gangs, e.g., Bloods v. Crips, etc. Gangsters are sometimes transferred to rival housing units as a form of harassment, because rival gangs will immediately attack them upon entering the unit.

    d. High-classification inmates are arbitrarily housed at low status, given the limited number of actual low-classification inmates (review of Form #4100A for various inmates housed in low units for 2012 will reveal the truth of this assertion).

    e. The housing of non-violent, low-classification, non-gang members at the GRVC was rare, and was likely done as a means of harassment since the conditions at the GRVC are the most oppressive and restrictive of all DOC facilities.

    f. Due to the large gang population at the GRVC, most inmates assume that all Black and Hispanics under age 35 to be gangsters. One housed on the Odd- and Even-Sides were assumed to be "Bloods," while those in the Annex were "Crips" by default.

    g. GRVC officials provided too few chairs and tables, allowed select inmates to occupy multiple chairs, allowed gangs to monopolize the food, telephones and televisions, and overall turned a blind eye to other iniquities committed by gang members out of fear or monetary gain. Such conditions, endemic to the GRVC, permitted a hostile living environment to fester among inmates.

    18. Given the dynamics of the GRVC, resulting from customs and policies implemented by Commissioner Schriro and Warden Duffy, Plaintiff suffered the following atypical conditions of confinement, which were uncommon to similarly-situated low-classification inmates at other DOC facilities:

    a. Plaintiff was one morning waiting alone in the Clinics "Annex" holding pen, when five Bloods members entered. Upon learning Plaintiff was from the Annex they incorrectly assumed he was a Crip. Sensing immediate danger Plaintiff stood, which sparked the gang to physically attack him. Fortunately, Plaintiff was able to exit the Clinic area with minor injuries.

    b. Plaintiff was confined to an individual cell for over three (3) additional hours everyday at GRVC, beyond the minimum standards promulgated by the N.Y.C. Board of Correction ("BOC").

    c. Plaintiff was subjected to over twenty (20) facility lock-downs by being locked in an individual cell for over 24 consecutive hours; with some lock-downs lasting over 72 hours. Such lock downs violated the minimum standards promulgated by the BOC.

    d. Plaintiff was subjected to over thirty (30) excessive cell searches in a one year period, resulting in legal papers being damaged or disorganized, loss of various commissary items and a "Body Cavity Search." Most of these searches were to harass the inmate population for complaining about the conditions at GRVC versus any legitimate penological interests.

    19. Beginning July 11, 2012, Plaintiff filed grievances requesting transfer back to the MDC or any other suitable facility for low-classification inmates. Warden Duffy, Commissioner Schriro and other DOC officials denied Plaintiff's request for transfer, vaguely citing "DOC discretion."

C. Deliberate Indifference to Future Health:

    20. From around May 2012 through January 2013, due to customs and policies implemented by Warden Duffy and Commissioner Schriro, Plaintiff was exposed to harmful non-natural radiation from GRVC's "SecurPass" machine over forty (40) times. Plaintiff was never suspected of having contraband any time he was scanned. Plaintiff's risk and fear of developing cancer increased each time he was arbitrarily exposed to radiation.

3

21. Beginning August 31, 2012, Plaintiff complained of being arbitrarily scanned by the Body Scanner. Warden Duffy, Commissioner Schriro, and other DOC officials refused to respond to any grievances regarding the Body Scanner, and therefore acquiesced to such conduct.

22. Warden Duffy, Commissioner Schriro and the general public at large were apprehensive of exposure to non-natural radiation, given the uncertainty about the health and genetic consequences of even small emissions. Despite this, the defendants implemented a policy of repeatedly x-raying inmates without any suspicion of possessing contraband. Additionally, Warden Duffy and Commissioner Schriro knew there practices were contrary to the recommendations of the SecurPass "Operational Manual," and also failed to train their subordinates of its suggested usage. Therefore, showing deliberate indifference to the Plaintiff's future health and risk of developing cancer.

D. Religious and Racial Prejudice:

23. Plaintiff suffered harassment and discrimination because of his race and religious preference in the following manner:

   a. On or about May 5, 2012, Plaintiff filed a form to change his religious preference from "None" to "Jewish."

   b. On or about June 26, 2012, Plaintiff was interviewed by Rabbi Richtman, the Jewish Chaplain. The Rabbi states the Plaintiff must present proof of Jewish membership from a reputable synagogue, which Plaintiff admits he does not belong. The Rabbi therefore refuses to sign the change of religion form, then references a civil case which acknowledged his actions were wrong. Despite this, the Rabbi states as a matter of principle that he does not want to mistakenly grant an assumed "gentile" or "proselyte" with a "Jewish Identity." When questioned on how non-Jews already have a "Jewish ID" for kosher meals, the Rabbi states "I have no control over that, but if I did, I would change things." When asked about obtaining a Torah, Tanakh or any other religious materials, he states "the Torah is too expensive to provide and no other religious materials are available."

   c. On or about July 11, 2012, Plaintiff files grievances regarding the Rabbi's refusal grant a religious preference change. Deborah Moultrie, Warden Duffy and Commissioner Schriro later upheld the Rabbi's decision, indicating the Plaintiff must present evidence from a synagogue.

   d. On November 19, 2012, the GRVC Director of Ministerial Services approves the Plaintiff's request for a "Jewish ID." The Director comments that the hurdles Plaintiff experienced were outrageous and not DOC policy. Then indicated the Rabbi's refusals were likely due to racism, because the Plaintiff was Black and the mistreatment of Black inmates by the Rabbi was an on-going issue.

   e. On November 30, 2012, Plaintiff receives a new Inmate ID specifying "Jewish" as his religion. Previously, Plaintiff was unable to receive Kosher meals without this new ID.

   f. On December 1st through 6th, 2012, defendants Captain Merrill, Captain Myers and Captain Proverbs knowingly encouraged or permitted officers in the Food Services Department to deny the Plaintiff proper kosher meals. Subsequently, Plaintiff was hospitalized after fainting from starvation, caused by refusing to eat non-kosher foods. See Dkt. #2, Exh. #8A2 ("Harassment Complaint" dated Dec. 10, 2012).

4

E. Harassment and Retaliation:

24. From February 2, 2012 through January 29, 2013, Plaintiff filed numerous grievances, 3-1-1 complaints, letters to politicians and prisoner organizations regarding living conditions and corruption at the GRVC. Plaintiff was also an Inmate Council representative for Units 15B and 9A. Because of this, Deborah Moultrie, the IGRC Supervisor, habored ill-feelings towards the Plaintiff and knowingly encouraged both inmates and GRVC officers to harass and intimidate him.

25. Ms. Moultrie (a pseudo-Union representative) had significant influence over most GRVC staff; because she knowingly manipulated the rules of the Grievance Program and coerced inmates to withdraw complaints that affected the officers individually or as a whole. She dominated the grievance program primarily by controlling all of the inmate votes on the grievance committee.

26. DOC Directive #3375R mandates that there be three (3) inmate voting members, i.e., "Inmate Grievance Representative," "Inmate Grievance Clerk" and "Inmate Housing Aide;" however those positions were either vacant or filled with porters, having no knowledge of their title or duties. As such, Ms. Moultrie could rubber-stamp denials of grievance hearings without the required inmate votes. See Dkt. #2, Exh. 6A ("IGRP Non-Compliant with Directive 3375R").

27. Plaintiff ("blackballed" as a "serial grievant") was subjected to harassment and retaliation for exercising his constitutional right to redress grievances, directly by Ms. Moultrie or other staff and inmates at her behest, in the following manner:

   a. Plaintiff filed a grievance regarding the kitchen not sending coffee missing from breakfast. This grievance was answered by Deputy Warden Texeira, who stormed into the housing unit screaming: "Corley! I hear your not getting your coffee, don't worry your gonna get it, Corley!" Deputy Warden Texeira knew the coffee was being stolen by inmates and screamed to suggest the Plaintiff was snitching on the inmates that were stealing the coffee. This resulted in the Plaintiff having an verbal altercation with a kitchen worker over the matter.

   b. On March 29, 2012, Plaintiff's cell was searched while absent at court. Officers searching the cell discarded commissary items the Plaintiff duly possessed. Such acts were for harassment and no other legitimate purpose.

   c. After attempting to file a grievance against Ms. Moultrie, she barked for me to leave her office. Upon exiting her office, she screamed out "you want to complain about me? Huh, you better worry about what that judge is gonna do to you after what you did to those little girls." This was overheard by several officers and inmates present at the programs office. This resulted in Plaintiff being harassed by inmates accusing him of being a "pedophile." The harassment and threats did not cease until he was approached by several inmates requesting to see his "paperwork." Some inmates still held resentments as they soon learned he was a "pimp."

   d. On July 30, 2012, Plaintiff was moved from Unit 15B to Unit 9A for unknown reasons. Coincidently, Plaintiff was the Inmate Council representative for Unit 15B, such move immediately caused the loss of this position. Additionally, movement from the Annex (15B) to the Odd-side (9A) was dangerous because inmates would assume Plaintiff was a Crip moving to a Bloods unit.

5

e. On September 8, 2012, Plaintiff was harassed and intimidated by Captain McQuade and Intelligence Officer Scott Thompson during a unit search. They both searched Plaintiff's cell along with four other officers in order to read his legal paperwork and other documents. Mr. Thompson read the contents of some legal notes over a cell-phone and walkie-talkie. Such actions were unusual, as authorization from the Warden was required to read an inmates legal papers. Captain McQuade and Mr. Thompson's intent was to intimidate the Plaintiff for filing grievances; with no other justification for their unusual acts because no other inmates faced this scrutiny.

f. Warden Duffy and Commissioner Schriro denied or disregarded Plaintiff's request to transfer from the GRVC, despite knowing Plaintiff was improperly housed at the facility, with the intent of keeping the Plaintiff under oppressive conditions for unknown reasons.

g. Captain Wynn repeatedly harassed the Plaintiff regarding kosher meals and constantly checked with unit officers to observe and log if Plaintiff eats any non-kosher foods, particularly on "chicken days."

h. Beginning December 1, 2012, Captains Merrill, Myers and Proverbs, knowingly acquiesced to food services staff refusing to provide the Plaintiff with kosher meals, as mentioned above.

i. On December 3, 2012, Plaintiff attempted to file the grievance entitled "Suicide Prevention Aides." Ms. Moultrie refused to accept this grievance, becoming hostile she screams for the Plaintiff to exit her office. This prompts nearby officers to physically remove the Plaintiff from her office, unnecessarily assuming he was a threat.

j. On December 6, 2012, Plaintiff's cell was searched while absent being treated for starvation. At the direction of Captain Wynn or Ms. Moultrie, officers damaged or discarded several of the Plaintiff's legal papers and commissary items. Plaintiff later learned that notes and records associated with this lawsuit and his criminal case were missing.

k. On numerous occassions during cell searches, officers would deliberately dump Plaintiff's legal papers on the floor and disorganize them, requiring him to spend hours to reorganize them. Such acts were for harassment at the direction of Captain Wynn or Ms. Moultrie.

l. On December 24, 2012, Captain Wynn moved the Plaintiff from Unit 9A to Unit 15B out of retaliation for his numerous complaints, knowing he would face adversity by moving from a "Blood Unit" to a "Crip Unit." Due to this transfer, Plaintiff was approached by six Crips from the adjoining 15A high-classification unit in the "Dangerzone" (an exclusive stairwell known for violence), seeking to learn if the Plaintiff was a Blood (by coming from the Odd-side). Fortunately, Plaintiff was not assaulted after convincing the group he was not a Blood.

F. Gross Negligence:

28. The defendants intentional and grossly negligent acts and omissions, individually and collectively, caused the Plaintiff to suffer: approximately one year of harassment and oppression, multiple intermittent 24 hour periods confined to one cell without due process, physical injuries, gang violence, loss of legal papers, multiple months without a proper religious diet, arbitrary exposure to harmful non-natural radiation, defamation, emotional distress, etc.

6

## MUNICIPAL LIABILITY

29. Defendant CITY OF NEW YORK via its policymakers Warden Duffy and Commissioner Schriro knowingly created customs and implemented or upheld unconstitutional policies which:

    a. Arbitrarily confined Plaintiff to a maximum security facility despite not meeting any criteria to justify such placement, particularly because inmates with similar charges (i.e. sex crimes against minors) were not typically housed at GRVC. Furthermore, exposing Plaintiff to gang violence due to the custom of unofficially designating select units for particular violent gangs.

    b. Arbitrarily exposed Plaintiff to non-natural radiation from its SecurPass machines without suspicion of possessing contraband in his internal organs. In or about December 2015, defendant CITY OF NEW YORK publicly admitted their use of the SecurPass was harmful to inmates and discontinue its further use.

    c. Confined Plaintiff and other inmates on 24 hour lock-downs several times without obtaining variances as promulgated by the BOC.

    d. Several months denied Plaintiff his constitutional right to practice his faith by refusing access to a religious diet or literature.

    e. Allowed gang members to monopolize the kitchen, televisions, telephones, tables and chairs, creating a hostile environment for the Plaintiff.

30. Defendant CITY OF NEW YORK via its policymakers Warden Duffy and Commissioner Schriro exercized deliberate indifference by failure to properly train its employees or halt unconstitutional and unlawful acts it knew its employees were committing (via previous complaints or otherwise), e.g.:

    a. Deborah Moultrie was permitted to implement the Grievance Program in ways which were contrary to the constitution or DOC directives, and coerced or intimidated inmates from filing or pursuing grievances. Also knowing that other Officers acted on behalf of Ms. Moultrie to retaliate against inmates that filed grievances they disliked.

    b. Rabbi Richtman was permitted to implement his Jewish Chaplaincy duties in ways which were contrary to the constitution or DOC directives by denying Black inmates the opportunity to practice the Jewish Faith.

    c. Deputy Warden Texeira and other officers were permitted to label inmates as "snitches" that filed grievances which they disliked, with the intent that other inmates would cause them harm.

7

CIVIL RIGHTS VIOLATIONS

31. Plaintiff repeats as if fully set forth here the allegations in Paragraphs 1 through 30, above. For COUNTS I through VII, the defendants are liable for compensatory damages, statutory damages, punitive damages and costs pursuant to 42 U.S.C. §§ 1983 and 2000cc, et seq.

COUNT I
(Atypical Confinement)

32. On February 2, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY and COMMISSIONER DORA B. SCHRIRO, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's fifth amendment rights to be free from "atypical confinement" and "substantial risk of harm" under the fourteenth amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, which resulted in Plaintiff enduring punitive detention, physical assault, gang violence, harassment and emotional distress. To wit: policymakers Warden Duffy and Commissioner Schriro knew (by custom, policy or otherwise) Plaintiff fit no criteria to be housed or transferred to GRVC and failed to correct the matter upon formal notice through the grievance system. Also, defendants knew Plaintiff would face substantial risk of harm at the GRVC because he was not a gang member and charged with promoting prostitution of a minor.

COUNT II
(Substantial Risk of Harm)

33. On February 2, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEBORAH MOULTRIE and DEPUTY WARDEN TEXEIRA, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's fifth amendment rights to be free from "substantial risk of harm" under the fourteenth amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, which resulted in Plaintiff enduring harassment and emotional distress. To wit: Ms. Moultrie labled the Plaintiff as a "child molester" and Deputy Warden Texeira labled him as a "snitch" with the intent that other inmates cause him harm; which was knowingly acquiesced by Warden Duffy and Commissioner Schriro (by custom, policy or otherwise).

COUNT III
(Deliberate Indifference to Future Health)

34. On or about May 1, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY and COMMISSIONER DORA B. SCHRIRO, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's fifth amendment rights to be free from "cruel and unusual punishment" under the fourteenth amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, resulting in Plaintiff being exposed to harmful non-natural radiation which increased his fear and risk of developing cancer in the future. To wit: Warden Duffy and Commissioner Schriro implemented a policy of arbitrarily "body scanning" inmates, regardless of any suspicion of possessing contraband.

8

## COUNT IV
(Equal Protection)

35. On or about June 26, 2012 through December 6, 2012, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, RABBI RICHTMAN, DEBORAH MOULTRIE, CAPTAIN WYNN, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS and CAPTAIN DARNLEY PROVERBS, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's equal protection rights under the first, thirteenth and fourteenth amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, resulting in Plaintiff being denied a religious diet and literature for several months, harassment, hospitalization and emotional distress.

## COUNT V
(Harassment and Retaliation)

36. In or about March 29, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEPUTY WARDEN TEXEIRA, DEBORAH MOULTRIE, CAPTAIN WYNN, CAPTAIN MCQUADE, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS, CAPTAIN DARNLEY PROVERBS and SCOTT THOMPSON, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's substantive due process, equal protection and petition of grievance rights under the first and fourteenth amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, resulting in Plaintiff's hospitalization, harassment, humiliation and emotional distress.

## COUNT VI
(Access to the Courts)

37. On December 6, 2012, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEBORAH MOULTRIE and CAPTAIN WYNN, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's access to the courts right under the first and fourteenth amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983, and willfully aided, commanded or induced the acts thereof, resulting in Plaintiff's loss of important legal records regarding this lawsuit and his criminal case.

## COUNT VII
(RLUIPA)

38. On or about June 26, 2012 through December 6, 2012, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, RABBI RICHTMAN, DEBORAH MOULTRIE, CAPTAIN WYNN, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS and CAPTAIN DARNLEY PROVERBS, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting under the color of state law, knowingly violated Plaintiff ROYCE CORLEY's statutory rights under the Religious Land Use and Institutionalized Persons Act pursuant to 42 U.S.C. §§ 2000cc, et seq., and willfully aided, commanded or induced the acts thereof, resulting in Plaintiff being denied a religious diet and literature for several months, harassment, hospitalization and emotional distress.

9

NEW YORK LAWS

39. Plaintiff repeats as if fully set forth here the allegations in Paragraphs 1 through 30, above. For COUNT VIII through X, the defendants are liable for compensatory damages, punitive damages and costs pursuant to New York law.

## COUNT VIII
### (Gross Negligence)

40. On or about February 2, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEPUTY WARDEN TEXEIRA, DEBORAH MOULTRIE, RABBI RICHTMAN, CAPTAIN WYNN, CAPTAIN MCQUADE, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS, CAPTAIN DARNLEY PROVERBS and SCOTT THOMPSON, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting knowingly and willfully, owed Plaintiff ROYCE CORLEY the duty of safety, preserving legal papers, providing a religious diet and literature, prevention of harm to future health and freedom from harassment or retaliation, the failures of which, resulted in Plaintiff's personal injuries, loss of legal papers, prevention from practicing his religious faith, increased risk of cancer and emotional distress, respectively.

## COUNT IX
### (Personal Injury)

41. On December 6, 2012, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEBORAH MOULTRIE, RABBI RICHTMAN, CAPTAIN WYNN, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS and CAPTAIN DARNLEY PROVERBS, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, acting knowingly and willfully, denied Plaintiff ROYCE CORLEY his religious diet for multiple days, and willfully aided, commanded or induced the acts thereof, which resulted in his phyical injuries and hospitalization for starvation.

## COUNT X
### (Emotional Distress)

42. On or about February 2, 2012 through January 29, 2013, in the Southern District of New York, and elsewhere, defendants WARDEN EDMUND DUFFY, COMMISSIONER DORA B. SCHRIRO, DEPUTY WARDEN TEXEIRA, DEBORAH MOULTRIE, RABBI RICHTMAN, CAPTAIN WYNN, CAPTAIN MCQUADE, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS, CAPTAIN DARNLEY PROVERBS and SCOTT THOMPSON, in their individual and official capacity as public officers of defendant CITY OF NEW YORK, knowingly and willfully committed negligent acts or omissions, which resulted in Plaintiff ROYCE CORLEY's severe emotional distress due to punitive confinement, hospitalization, harassment, humiliation, defamation, physical injuries, fear of cancer and denial of religious rights.

PRAYER

WHEREFORE, Plaintiff ROYCE CORLEY, acting pro se, requests that this Court render judgment against the defendants for--

A. Compensatory damages in the sum to be shown at trial, but in no event less than the following for each defendant: (i) $300,000 against the CITY OF NEW YORK; (ii) $150,000 against DORA B. SCHRIRO; (iii) $90,000 against EDMUND DUFFY; (iv) $45,000 against DEBORAH MOULTRIE; (v) $15,000 against RABBI RICHTMAN; (vi) $5,000 against CAPTAIN MCQUADE, CAPTAIN WYNN, CAPTAIN RANDY MERRILL, CAPTAIN DESMOND MYERS, CAPTAIN DARNLEY PROVERBS, DEPUTY WARDEN TEXEIRA and SCOTT THOMPSON;

B. Punitive damages, in the sum to be shown at trial, to punish each liable defendant and to discourage any further intentional wrongful acts and constitutional violations;

C. Declaratory relief, declaring as unconstitutional: (i) the arbitrary pre-trial confinement of non-violent, low-classification, non-gang member inmates in maximum security confinement; and (ii) the policy of requiring inmates to provide extrinsic evidence of religious affliation in order to receive a religious diet or literature;

D. Costs of suit and reasonable attorney's fees, where applicable, including any pre- and post-judgment interest allowed by law; and whatever relief deemed just and proper.

Dated: May 5, 2016
       Danbury, CT

                                    _____
                                         P L A I N T I F F
                                    Royce Corley, pro se
                                    Reg. No. 68011-054
                                    Federal Correctional Institution
                                    33 1/2 Pembroke Road
                                    Danbury, CT 06811-3099

2016 MAY 23  AM 11:52

LEGAL MAIL

⇔68011-054⇔
Royce Corley
Reg. No. 68011-054
Federal Correctional Institution
33 1/2 Pembroke Road
Danbury, CT 06811-3099
United States

FEDERAL CORRECTIONAL INSTITUTION DANBURY
33 1/2 PEMBROKE ROAD, DANBURY, CT 06811
DATE  5/16/16
THE ENCLOSED LETTER WAS PROCESSED THROUGH
SPECIAL MAILING PROCEDURES FOR FORWARDING TO YOU.
THE LETTER HAS NEITHER BEEN OPENED NOR INSPECTED.
IF THE WRITER RAISES A QUESTION OR PROBLEM OVER
WHICH THIS FACILITY HAS JURISDICTION, YOU MAY
WISH TO RETURN THE MATERIAL FOR FURTHER
INFORMATION OR CLARIFICATION. IF THE WRITER
ENCLOSES CORRESPONDENCE FOR FORWARDING

⇔68011-054⇔
Pro Se Office
U.S. District Court
Southern District of New York
500 Pearl Street
NEW YORK, NY 10007
United States

U.S.M.P.3
SDNY

[Tiffany Lamp 1¢ × 2, FOREVER stamps × 6]