UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 09/28/2017

-------------------------------------------------------------- X
                           :

ROYCE CORLEY,                         :
                           :

               Plaintiff,        :             1:14-cv-3202-GHW
                           :

            -against-          :         MEMORANDUM OPINION
                           :                AND ORDER

CITY OF NEW YORK, EDMUND DUFFY   :
(WARDEN), DORA B. SCHRIRO, DEBORAH  :
MOULTRIE, CAPTAIN WYNN, CAPTAIN    :
MCQUADE, CAPTAIN RANDY MERRILL,    :
CAPTAIN DESMOND MYERS, CAPTAIN     :
DARNLEY PROVERBS, DEPUTY WARDEN   :
TEXEIRA, RABBI RICHTMAN, and SCOTT   :
THOMPSON                             :
                           :
              Defendants.      :
-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Plaintiff, Mr. Royce Corley, was a pre-trial detainee on Rikers Island in 2012. While housed

there, Mr. Corley asserts that he suffered a litany of abuses at the hands of prison officials. He

contends that prison officials violated his due process rights in various ways, showed deliberate

indifference to his conditions of confinement, and retaliated against him for filing grievances about

the prison. He also asserts that the prison staff initially refused his request to change his religious

preference and prohibited him from obtaining kosher food in violation of his religious liberties. The

Court previously dismissed Mr. Corley's Second Amended Complaint in part, but granted him leave

to amend the complaint. Defendants have now moved to dismiss the Third Amended Complaint

under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because many of Plaintiff's claims

either fail to state a legally cognizable claim or are inadequately pleaded, Defendants' motion to

dismiss is DENIED in part and GRANTED in part.

## I.    BACKGROUND[1]

Mr. Corley was a pre-trial detainee who entered the custody of the City of New York's Department of Correction ("DOC") on January 26, 2012. He was briefly detained at the Manhattan Detention Complex ("MDC"), a medium-security facility. TAC ¶ 15. While at the MDC, Mr. Corley was assessed and his security risk was classified as a five—the lowest security risk category. *Id.* Nevertheless, on February 2, 2012, Mr. Corley was "transferred without notice or a hearing" to the George R. Vierno Center ("GRVC"), a jail on Rikers Island, known as "The Beacon." TAC ¶ 16. According to Mr. Corley, the GRVC is designed for the "most violent high-classification inmates," and is used to house such inmates; in particular, members of violent street gangs are concentrated there. TAC ¶ 17(a).

The complaint explains that in 2012, the GRVC had three sections in which inmates were housed: the "Odd-Side," the "Even-Side," and "the Annex." TAC ¶ 17(b). In 2012, members of the Bloods gang and affiliated groups were housed in the Odd-Side and Even-Side, while the Annex was known for its high concentration of Crips gang members. Non-gang member "neutrals" were sprinkled throughout the complex, based on their security risk group classification. TAC ¶ 17(b). The complaint asserts that the GRVC rarely housed non-violent, low-classification, non-gang members; Mr. Corley alleges that housing such individuals at the GRVC was "likely done as a means of harassment since the conditions at the GRVC are the most oppressive and restrictive of all DOC facilities." TAC ¶ 17(e). The complaint alleges that Defendants Warden Duffy and Commissioner Schriro knew that Mr. Corley was "improperly housed" at the GRVC, but nevertheless denied Mr. Corley's requests to be transferred from the facility. TAC ¶¶ 19, 27(f).

Mr. Corley alleges that prison officials provided too few chairs and tables, allowing gang

---

[1] The following facts are taken from Plaintiff's third amended complaint, and are accepted as true for purposes of this opinion. *See* Third Amended Complaint ("TAC" or "complaint"), Dkt. No. 73.

members to "monopolize" the space at the GRVC, thereby "permitt[ing] a hostile living environment to fester among inmates." TAC ¶ 17(f). He also alleges that the high concentration of gang members and other high security risk prisoners in the GRVC exposed him to gang violence. He recites two incidents relevant to this case. First, he says that once, while waiting alone in the Annex holding pen, five Bloods members entered and, upon learning that Mr. Corley was housed in the Annex, "incorrectly assumed he was a Crip." Sensing danger, Mr. Corley stood up, "which sparked the gang to physically attack him. Fortunately, Plaintiff was able to exit the []area with minor injuries." TAC ¶ 18(a). Mr. Corley had another lucky escape from possible gang violence later during his stay in the GRVC. One day, while in the "Dangerzone," an "exclusive" stairwell "known for violence," he was cornered by six Crips, who had learned that he had been transferred from a "Blood Unit." TAC ¶ 17(l). Fortunately, the incident ended calmly: Mr. Corley was able to convince the gang members that he was not a Blood, and they left him alone. *Id.*

The complaint also alleges that the customs and policies of the GRVC were excessive as applied to him, and were "uncommon to similarly-situated low-classification inmates at other DOC facilities." TAC ¶ 18. For example, Mr. Corley states that he was subject to over twenty facility-wide lock-downs, during which he was confined to his cell for twenty-four hours a day. Some of the lock-downs lasted for more than seventy-two hours, during which time he could not leave his cell. TAC ¶ 18(c). Mr. Corley also asserts that he was confined to an individual cell for over three additional hours per day at the facility, beyond "the minimum standards promulgated by the N.Y.C. Board of Correction ("BOC")." TAC ¶ 18(b). He does not allege that he was the only prisoner at the facility subject to these lock-downs, or that this confinement was punitive.

Mr. Corley also asserts that he was scanned by a "SecurPass" x-ray machine more than forty times from May 2012 through January 2013. TAC ¶ 20. He contends that each scan exposed him to "harmful non-natural radiation" and asserts that his "risk and fear of developing cancer increased

each time he was arbitrarily exposed to radiation." *Id.* He asserts no specific injury from the scans. Mr. Corley alleges that he was selected for scanning "arbitrarily," and not on account of suspicion that he harbored contraband. TAC ¶ 21. He alleges that Defendants Duffy, Schriro, and "the general public" were "apprehensive of exposure to non-natural radiation" from the SecurPass machines, but nevertheless refused to respond to Mr. Corley's grievances about the use of the machine. TAC ¶¶ 21-22.

Mr. Corley filed a number of grievances about prison conditions during his time at the GRVC. The alleged inflammatory responses to those grievances form the basis of Mr. Corley's retaliation claims here. For example, after Mr. Corley complained about lack of coffee in his meals, Deputy Warden Texeira stormed into the unit screaming "Corley Corley! I hear you['re] not getting your coffee, don't worry your [sic] gonna get it, Corley!" TAC ¶ 27(a). According to the complaint, Deputy Warden Texeira knew inmates were stealing the coffee, and her shouted comments were intended to suggest that Mr. Corley was informing on the thieves. *Id.* Mr. Corley alleges that the comments provoked a verbal altercation between him and a kitchen worker. *Id.*

Mr. Corley also filed grievances with Defendant Deborah Moultrie, a supervisor who oversaw the Inmate Grievance Resolution Committee ("IGRC"). The complaint alleges she "harbored ill-feelings" towards Mr. Corley, and "knowingly encouraged both inmates and GRVC officers to harass and intimidate him." TAC ¶ 24. Mr. Corley explains that Ms. Moultrie "dominated the grievance program" by coercing inmates to withdraw complaints and by "controlling all of the inmate votes" on the IGRC. TAC ¶ 25. In one instance recounted in the complaint, Mr. Corley tried to file a grievance against Ms. Moultrie. After exiting Ms. Moultrie's office, she shouted after him "you want to complain about me? Huh, you better worry about what that judge is gonna do to you after what you did to those little girls." TAC ¶ 27(c). This comment, overheard by several officers and inmates, resulted in several days of harassment by inmates, who

accused Mr. Corley of being a child molester. The harassment ended after inmates asked Mr. Corley for his paperwork, presumably regarding the true nature of his alleged crime. The paperwork cleared the misimpression caused by Ms. Moultrie's comment, but "[s]ome inmates still held resentments as they soon learned he was a 'pimp.'" *Id.* Mr. Corley also attempted to file a grievance with Ms. Moultrie on December 3, 2012 concerning "suicide prevention aides." TAC ¶ 27(i). The complaint alleges that Ms. Moultrie refused to accept this grievance and became hostile towards Mr. Corley. *Id.* Ms. Moultrie demanded that Mr. Corley leave her office, which prompted nearby officers to physically remove him from the office.

In addition to the grievances described in detail in the complaint, Mr. Corley also states that he filed "numerous grievances, 3-1-1 complaints, [and] letters to politicians and prisoner organizations" concerning the conditions at GRVC. TAC ¶ 24. Mr. Corley believes that his repeated complaints about the conditions at the prison led him to be "'blackballed' as a 'serial grievant'" by GRVC officials; Mr. Corley alleges that, as a result of this, he faced significant harassment and retaliation at the facility. TAC ¶¶ 24, 27. For instance, he claims that he was subjected to over thirty "excessive" cell searches in the span of one year, which resulted in damage to and disorganization of his legal papers, the loss of various commissary items, and included a body cavity search. TAC ¶ 18(d). Mr. Corley contends that most of these searches were to harass "the inmate population" for complaining about conditions at the GRVC. *Id.*

Mr. Corley specifically notes that a March 29, 2012 search of his cell took place while he was in court, during which commissary items of his were discarded. TAC ¶ 27(b). The complaint also details a "unit search" on September 8, 2012, during which Defendants Captain McQuade and Intelligence Officer Scott Thompson allegedly harassed and intimidated Mr. Corley by searching his cell and reading his paperwork. TAC ¶ 27(e). In that incident, Mr. Thompson read selections from Mr. Corley's legal papers over a walkie-talkie. Mr. Corley asserts that the Defendants' "intent was to

intimidate the Plaintiff for filing grievances," and that no other inmates faced a similar level of scrutiny. TAC ¶ 27(e). Mr. Corley also alleges that his cell was searched on December 6, 2012, while he was being treated for health issues, and that the search resulted in the loss of notes and records associated with both this lawsuit and his criminal case. TAC ¶ 27(j). The complaint contends that "on numerous occasions during cell searches," his papers were deliberately dumped on the floor and disorganized, requiring hours of his time to reorganize them. TAC ¶ 27(k). The complaint repeatedly contends that such cell searches "were for harassment" and were conducted "at the direction of Captain Wynn or Ms. Moultrie." *Id.*

Finally, Mr. Corley alleges that he was twice moved to a different unit within the GRVC. First, on July 30, 2012, he was moved from Unit 15B to Unit 9A "for unknown reasons," causing him to lose his position as the Inmate Council representative for Unit 15B. TAC ¶ 27(d).[2] The complaint also contends that this transfer from the Annex to the Odd-Side was dangerous because inmates would assume that Mr. Corley was a Crip moving to a Bloods unit. *Id.* Mr. Corley was moved a second time on December 24, 2012, this time from Unit 9A back to Unit 15B. TAC ¶ 27(l). Mr. Corley alleges that he was moved by Defendant Captain Wynn "out of retaliation for [Plaintiff's] numerous complaints," because Captain Wynn knew that Mr. Corley would "face adversity" due to the transfer. *Id.* It was after this second transfer that the incident in the "Dangerzone" took place in which Mr. Corley was nearly assaulted by Crips gang members; Plaintiff does not allege that he faced any adversity beyond that confrontation as a result of the unit transfer.

While at the GRVC, Mr. Corley experienced a religious conversion. On May 5, 2012, just over three months after his arrival there, Mr. Corley, an African-American man, filed a form to change his religious preference from "None" to "Jewish." TAC ¶ 23(a). On June 26, 2012, the

---

[2] Elsewhere, however, Mr. Corley asserts that he was the Inmate Council representative for both Unit 15B and Unit 9A. TAC ¶ 24.

Jewish Chaplain at the GRVC, Rabbi Richtman, interviewed Mr. Corley. The Rabbi refused to accept Mr. Corley's change of religion form, stating that "he does not want to mistakenly grant an assumed 'gentile' . . . with a 'Jewish Identity.'" TAC ¶ 23(b). The Rabbi also refused to provide Mr. Corley with a Torah, Tanakh, or any other religious materials. The complaint alleges that Mr. Corley filed grievances regarding the Rabbi's refusal to grant a religious preference change on July 11, 2012, and that the Rabbi's decision was later upheld by Defendants Moultrie, Warden Duffy, and Commissioner Schriro. TAC ¶ 23(c).

Eventually, on November 19, 2012, the GRVC director of ministerial services approved Mr. Corley's change of religious preference. TAC ¶ 23(d). The director told Mr. Corley that he believed that "the hurdles Plaintiff went through to approve the form [were] outrageous . . . ." *Id.* He went on to say much more. As the complaint asserts: "[The Director t]hen indicated [that] the Rabbi's refusals were likely due to racism, because the Plaintiff was Black and the mistreatment of Black inmates by the Rabbi was an on-going issue." *Id.*

Mr. Corley finally received a new inmate ID stating that Mr. Corley's religion was "Jewish" on November 30, 2012. Without the new ID, Mr. Corley was unable to receive kosher meals. TAC ¶ 23(e). From December 1 through December 6, 2012, even with the new ID, the GRVC continued to deny Mr. Corley kosher meals. Mr. Corley alleges that Defendants Captain Merrill, Captain Myers, and Captain Proverbs "knowingly encouraged or permitted" food service workers to deny Mr. Corley kosher meals. TAC ¶¶ 23(f); 27(h). While it is unclear what Mr. Corley ate or was willing to eat before he received his new ID card, from December 1 he refused to eat non-kosher food. On several occasions during that time, Captain Wynn would check with unit officers to see if Mr. Corley was eating, and instructed that they make a log if he ate any non-kosher foods. TAC ¶ 27(g). But Mr. Corley held fast, and fasted. On December 6, 2012, he was hospitalized due to his refusal to eat non-kosher meals "after fainting from starvation, caused by refusing to eat non-kosher foods."

TAC ¶ 23(f). Mr. Corley's detention at the GRVC ended on January 29, 2013 when he was transferred to federal custody. TAC ¶ 3.

## II. PROCEDURAL HISTORY

Mr. Corley commenced this action on April 28, 2014, and has since amended his complaint three times. On September 30, 2015, this Court denied in part and granted in part Defendant City of New York and Warden Edmund Duffy's motion to dismiss the Second Amended Complaint. Dkt. No. 41, *Corley v. City of New York, et al.*, No. 14-cv-3202-GHW, 2015 WL 5729985 (S.D.N.Y. Sept. 30, 2015) ("2015 Opinion").

On May 26, 2016, Mr. Corley filed his Third Amended Complaint ("TAC"). Dkt. No. 73. Defendants moved to dismiss the TAC on September 15, 2016. Dkt. No. 90 (Defs.' Mot.). On October 18, 2016, Plaintiff opposed the Defendants' motion. Dkt. No. 92 (Pl.'s Opp'n). Defendants filed a reply brief on November 9, 2016. Dkt. No. 97 (Defs.' Reply). For the reasons explained below, Defendants' motion is granted in part and denied in part.

## III. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79). A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557). Further, despite the well-established rule in this circuit that *pro se* submissions are to be liberally construed and interpreted to raise "the strongest arguments they suggest," *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006), the plausibility standard applies equally to *pro se* complaints. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

## IV.  DISCUSSION

Defendants move to dismiss the TAC in its entirety, arguing that Plaintiff fails to state any claim. As it did with the 2015 Opinion, the Court will generally adopt the organization of claims in Defendants' motion. Mr. Corley's TAC does not differ substantially from his previous complaints; as a result, the Court's conclusions as to the viability of Plaintiff's claims following Defendants' motion to dismiss do not differ substantially from the conclusions reached in the 2015 Opinion. Where noted below, the Court references and adopts its previous decision.

### A. Section 1983 Claims

Mr. Corley has asserted a number of claims under 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F. 2d 137, 142 (2d Cir. 1999) (citing *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)). "A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the plaintiff of his rights." *Ross v. Westchester Cty. Jail*, No. 10-cv-3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). Additionally, where, as here, a plaintiff is seeking money damages against the defendants, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under Section 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

Mr. Corley's 1983 claims are not neatly parsed or classified by type of claim, and he pleads the first six "counts" of his TAC as claims brought pursuant to section 1983. Liberally construed, Mr. Corley's complaint raises constitutional claims under the Fourteenth, Fourth, and First Amendments. First, Mr. Corley alleges that Defendants violated his due process rights under the Fourteenth Amendment by transferring him to the GRVC and between units within the facility, and by destroying his personal property and his legal paperwork. Next, Mr. Corley alleges that Defendants subjected him to unconstitutional conditions of confinement and showed deliberate indifference to his health and safety, also in violation of the Fourteenth Amendment. Mr. Corley's Fourth Amendment claims relate to his claims concerning unreasonable searches of his cell and the

prison's use of the SecurPass machine.  Finally, Mr. Corley brings 1983 claims under the First

Amendment for retaliation.

### 1.    Due Process Claims

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of

life, liberty, or property without due process of law, and 'those who seek to invoke its procedural

protection must establish that one of these interests is at stake.'"  *Victory v. Pataki*, 814 F.3d 47, 59

(2d Cir. 2016), *as amended* (Feb. 24, 2016) (citing *Graziano v. Pataki,* 689 F.3d 110, 114 (2d Cir. 2012)).

"[S]tandard analysis under that provision proceeds in two steps:  We first ask whether there exists a

liberty or property interest of which a person has been deprived, and if so we ask whether the

procedures followed by the State were constitutionally sufficient."  *Id.* (citing *Swarthout v. Cooke,* 562

U.S. 216, 219 (2011)).  "Liberty interests may arise directly from the Due Process Clause itself or

from statutes, regulations, or policies enacted by the state."  *Victory*, 814 F.3d at 59 (citing *Wilkinson

v. Austin,* 545 U.S. 209, 221-22 (2005)).

### a.    Transfer to the GRVC

Mr. Corley alleges that his transfer to the GRVC in February 2012 "without notice or

hearing" violated his due process rights.  TAC ¶ 16.  In essence, he argues that his low security

classification should have prevented his transfer to GRVC:  he contends in his complaint that his

transfer was therefore "likely done as a means of harassment," TAC ¶ 17(e), but in opposing

Defendants' motion to dismiss he contends only that the transfer was done "arbitrarily," Pl.'s Opp'n

at 2.  He further alleges that his transfers between units in the GRVC were done "for unknown

reasons."  TAC ¶ 27(d).[3]

---

[3] In his opposition, Mr. Corley asserts that he seeks "no independent claim based on his transfers within the
facility.  Such facts are alleged solely to express the harassment and retaliation Plaintiff experienced . . . ."
Pl.'s Opp'n at 3.  Nevertheless, in liberally construing Plaintiff's complaint to "raise the strongest arguments
that [it] suggest[s]," the Court finds it prudent to consider whether the intra-prison transfers alleged in the

The Constitution does not "grant[] a prisoner a liberty interest in the location of his place of confinement." *Fermin-Rodriguez v. Westchester Cty. Jail Med. Pers.*, 191 F. Supp. 2d 358, 363 (S.D.N.Y. 2002), *as amended* (Mar. 25, 2002) (citing *Persico v. Gunnell*, 560 F. Supp. 1128, 1132-33 (S.D.N.Y. 1983)). Moreover, New York law permits the transfer of inmates from one facility to another, and does not place conditions on the discretionary power of the commissioner of corrections to transfer prisoners. *Fermin-Rodriguez*, 191 F. Supp. 2d at 363; *see also Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir. 1988) ("New York Law does not place conditions on interprison transfers."). Plaintiff therefore had no liberty interest under either federal or state law to be located at a particular prison facility, and his transfer therefore cannot be the basis of a due process claim. Similarly, Plaintiff had no liberty interest in an assignment to a particular unit within the GRVC. *See Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 129 (2d Cir. 1991) ("[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself.") (internal citation and quotation marks omitted).

Mr. Corley's insistence that his due process rights were violated is not persuasive; as with the SAC, the TAC does not include any allegations that Plaintiff's transfers were done for punitive reasons. The case law Plaintiff cites to in opposing Defendants' motion is unavailing, as those cases refer to due process rights implicated by the imposition of "maximum security confinement" and "restrictive housing." *See Rhem v. Malcom*, 371 F. Supp. 594, 624 (S.D.N.Y. 1974), *supplemented*, 377 F. Supp. 995 (S.D.N.Y. 1974), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974) (holding that the imposition of maximum security confinement, including lock-ins that lasted 16 hours per day, violated the due process rights of some pre-trial detainees); *People ex rel. Furde v. New York City Dep't of Correction*, 796 N.Y.S.2d 891, 900 (Bronx Sup. Ct. 2005) (holding that punitive segregation wherein

---

complaint state a separate claim for a deprivation of Plaintiff's due process rights. *Triestman*, 470 F.3d at 474-75.

petitioner was separated from general population without a hearing and was "confined to his cell for 23 hours a day for over 6 months" violated the petitioner's due process rights).  Mr. Corley does not assert that he was put into any kind of restricted or segregated housing or that his transfers were a form of punishment.  Instead, he argues that his placement within the general population of the GRVC was not justified because the facility was "designed for housing the most violent high-classification inmates," whereas he was categorized "in the lowest security category."  TAC ¶¶ 15; 17(a).  Ultimately, Plaintiff does not have a protected liberty interest to be housed at a particular prison or unit, and therefore cannot state a due process claim based on his transfer to or within the GRVC.[4]  That claim is therefore dismissed.

### b. Access to Inmate Grievance Resolution Program

Mr. Corley alleges that Defendant Moultrie "knowingly manipulated the rules of the [Inmate] Grievance Program and coerced inmates to withdraw complaints . . ." and that the IGRC was not properly staffed with inmate representatives.  TAC ¶¶ 24-26.  However, as the Court explained in its 2015 Opinion, Plaintiff did not have a liberty interest to access the GRVC's grievance program that would provide a basis for a constitutional due process claim here.  *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."); *Mimms v. Carr*, No. 09-cv-5740, 2011 WL 2360059, at *10 (E.D.N.Y. June 9, 2011) *aff'd*, 548 F. App'x 29 (2d Cir. 2013) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest.").  As a result, Defendant Moultrie's alleged failure to operate the grievance process "properly" does not state a claim for violation of Plaintiff's rights.

---

[4] To the extent Plaintiff contends that these transfers were done as retaliation for his filing of grievances, that claim is discussed below in connection with Plaintiff's First Amendment claims.

### c.    Destruction of Personal Property

As in his previous complaint, Mr. Corley raises claims in the TAC relating to the destruction

of his personal property during "excessive" cell searches.[5]  However, because Mr. Corley does not

claim that he was denied adequate post-deprivation procedures by which to report the destruction of

his property, and because the destruction of property alone does not give rise to a cognizable due

process claim, that claim is dismissed.  *Toliver v. City of New York*, No. 10-cv-5806, 2013 WL 6476791,

at *7 (S.D.N.Y. Dec. 10, 2013), *report and recommendation adopted*, No. 10-cv-5806, 2014 WL 549402

(S.D.N.Y. Feb. 11, 2014) ("Whether negligent or deliberate, the destruction of an inmate's property

caused by a prison officer's unauthorized conduct does not give rise to a claim under the Due

Process Clause if the state provides that inmate with an adequate postdeprivation remedy. . . .  It is

well established that New York provides inmates with the opportunity for a meaningful

postdeprivation hearing through state law causes of action for negligence, replevin, or conversion

which could fully compensate [the plaintiff] for his alleged property loss.") (internal citations and

quotation marks omitted).  As a result, Plaintiff has not stated a due process claim for the

destruction of his property, and that claim is dismissed.

### d.    Destruction of Legal Papers

While Plaintiff cannot state a due process claim based on the destruction of his commissary

items, his allegations concerning the destruction of his legal papers implicates a separate

constitutional right of access to the courts:  "a right alternately grounded in the Article IV Privileges

and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process

---

[5] As with this claim regarding intra-facility transfers, in opposing Defendants' motion, Mr. Corley contends that he "asserts no independent claim based on the 'destruction of commissary items.'  Such facts are alleged solely to express the harassment and atypical conditions of confinement Plaintiff experienced."  Pl.'s Opp'n at 3.  The Court nevertheless examines the TAC to raise the strongest arguments that it suggests, and therefore addresses the extent to which Plaintiff's arguments concerning the destruction of his property states a claim under the Due Process Clause.

Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses." *Christopher v. Harbury,* 536 U.S. 403, 414-415 & n.12 (2002). As the Second Circuit has explained,

> [l]egal documents have characteristics that differentiate them from mere "property" whose destruction can be adequately remedied by a generic property-deprivation state law. Their theft or destruction, for example, may irrevocably hinder a prisoner's efforts to vindicate legal rights. . . . It is now established beyond doubt that prisoners have a constitutional right of access to the courts.

*Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (citing *Bounds v. Smith,* 430 U.S. 817, 821-22, (1977)).

Although the Court held that Plaintiff's SAC alleged sufficient facts regarding interference with his legal papers to survive Defendants' motion to dismiss that complaint, *see* 2015 Opinion, 2015 WL 5729985, at *10, with the benefit of additional briefing on this issue, the Court deviates from its previous conclusion here. To state a claim for denial of access to the courts, "a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir. 1997)). Courts in this district have held that a plaintiff is required to "demonstrate actual injury and specify which legal matter Defendants' alleged tampering hindered him from pursuing." *Shepherd v. Fisher*, No. 08-cv-9297, 2017 WL 666213, at *39 (S.D.N.Y. Feb. 16, 2017); *see also Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (internal citation omitted).

Mr. Corley has not alleged that the destruction or disorganization of his papers caused any such "actual injury." He merely claims that his papers were lost or disorganized, "requiring [Plaintiff] to spend hours to reorganize them." TAC ¶ 27(k). He does not allege any facts that

indicate that this disorganization prevented him from pursuing a claim or filing a timely submission. In his opposition, Mr. Corley contends that any showing of an actual injury due to the destruction of his legal papers is "contingent upon an adverse or prejudicial disposition in the instant case and criminal case." Pl.'s Opp'n at 6. This argument is not persuasive. Plaintiff must plead an "actual injury" resulting from the destruction of his legal papers; the uncertain possibility of future harm does not satisfy the "actual harm" requirement. *See Lewis v. Casey*, 518 U.S. 343, 351 (1996) (holding that an "actual-injury" requirement is a "constitutional prerequisite" of an access-to-courts claim, and that as a result, "the inmate therefore must go one step further and demonstrate that the alleged [denial of access] hindered his efforts to pursue a legal claim."). Moreover, such a disposition would not necessarily arise out of the destruction of legal papers three years prior. Mr. Corley does not plead that his right of access to the court was chilled or impaired by the destruction of his legal papers, and his claim for denial of access to the courts therefore does not withstand Defendants' motion to dismiss.

### e. Lock-Down and Lock-Out Practices

Mr. Corley alleges that while housed at the GRVC, he was kept in his cell for "three additional hours everyday [sic]" beyond what was allegedly permitted by the BOC, that the facility was "locked-down" on more than twenty occasions, and that those lock-downs kept Plaintiff in his cell for twenty four consecutive hours, with some lasting more than seventy-two hours. TAC ¶¶ 18(b), 18(c). In the 2015 Opinion, and *infra* § 2(c), the Court analyzed these facts as raising a claim for deliberate indifference to unconstitutional conditions of confinement. In opposing Defendants' motion to dismiss the TAC, however, Plaintiff contends that he asserts these facts "to express the atypical confinement that Plaintiff experienced . . . Plaintiff possessed a state-created liberty interest in not being confined to a cell longer than required by policy." Pl.'s Opp'n at 5. Mr. Corley

references the "minimum standards" promulgated by the BOC, and specifically directs the Court to one of the rules and regulations codifying those standards, which reads as follows:

> No prisoner shall be required to remain confined to his or her cell except for the following purposes:
>> (1)  At night for count or sleep, not to exceed eight hours in any 24-hour period;
>> (2)  During the day for count or required facility business that can only be carried out while prisoners are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count.  This paragraph shall not apply to prisoners confined in enhanced supervision housing, who may be locked in during the day for up to nine hours in any 24-hour period.

N.Y. Comp. Codes R. & Regs., tit. 40 § 1-05(b).[6]  As a result, the Court also construes these allegations as seeking to raise a due process claim.

A liberty interest may arise "from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (internal citations omitted).  The Second Circuit has explained that in order to demonstrate the existence of a state-created liberty interest, "a prisoner must show that state statutes or regulations require, in language of an unmistakably mandatory character, that a prisoner may not suffer a particular deprivation absent specified predicates." *McMahon v. Fischer*, 446 F. App'x 354, 356 (2d Cir. 2011) (citing *Vega v. Lantz,* 596 F.3d 77, 83 (2d Cir. 2010) (internal quotation marks omitted).  "[T]he mere adoption of procedural guidelines governing day-to-day prison administration, without more, will not give rise to a state-generated liberty interest." *Maldonado v. Kinlock*, No. 09-cv-8435, 2012 WL 3597049, at *3 (S.D.N.Y. Aug. 21, 2012).  Furthermore, if state-created procedural rules do not impose "substantive limitations on official discretion," then they do not result in a protected liberty interest.  *See Walker v. Shaw,* No. 08-cv-10043, 2010 WL 2541711, at *6 (S.D.N.Y. June 23, 2010) (quoting *Korkola v. N.Y.C. Dep't of Corr.,* No. 84-cv-5740, 1986 WL 9798, at *4-5 (S.D.N.Y. Sept. 4, 1986)); *see also Olim v.*

---

[6] The Court takes judicial notice of the entirety of the text of this provision of the DOC Minimum Standards. *See, e.g., Johnakin v. NYC Dep't of Corr.*, No. 11-cv-4807, 2013 WL 5519998, at *11 (E.D.N.Y. Sept. 30, 2013) (taking judicial notice of DOC Minimum Standards).

*Wakinekona,* 461 U.S. 238, 249 (1983) ("[A] state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the State's decisionmakers.'") (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467 (1981) (Brennan, J., concurring). Moreover, even if such mandatory rules exist, "a prisoner who experiences a deprivation arising under mandatory rules has no actionable due process claim if other prisoners experience approximately the same deprivation in the ordinary administration of the prison with sufficient regularity that such deprivation is typical." *Vega,* 596 F.3d at 83 (citing *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir. 1999)). That is,

> actions under the Due Process Clause are reserved for prisoners enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison. Where a statute limits a prison's ability to impose a constraint as a punishment, but the prison makes a practice of imposing for non-punitive reasons a constraint endured under similar conditions and for a similar duration with sufficient regularity, then freedom from the deprivation is not a right of "real substance" which due process protects.

*Welch v. Bartlett,* 196 at 392-93 (citing *Sandin v. Connor,* 515 U.S. at 472, 478, 480 (1995).

As an initial matter, as the Court observed in its 2015 Opinion, conditions that are in conflict with the Minimum Standard Guidelines are not automatically deemed to be violations of constitutional rights. *Johnakin,* 2013 WL 5519998, at *11 ("[A]llegations of a violation of the Minimum Standards, which reflect the New York City Board of Correction's views of 'the basic elements necessary to promote safe, secure and humane jail environments,' . . . do not make out a violation of constitutional rights or federal law."). Regardless, even if the regulation did create a liberty interest, Plaintiff has not pleaded that any of the alleged conditions endured were different from what other prisoners experienced—indeed, the TAC states that the lock-downs were done on a facility-wide basis every day. TAC ¶ 18(b). As a result, the Court cannot conclude that Plaintiff has an actionable due process claim for the time he was required to remain in his cell, as he has not

pleaded any facts to suggest that this deprivation was not part of the ordinary administration of the GRVC.

In addition, the Court heeds the Supreme Court's conclusion that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979). The regulation Plaintiff contends was violated itself contemplates the importance of security and safety in its application. N.Y. Comp. Codes R. & Regs., tit. 40 § 1-05(a) ("The time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility."). Ultimately, the complaint fails to plausibly suggest that either the lock-down or lock-in practices Plaintiff complains of were arbitrary, and remaining "mindful of . . . the deference we owe prison officials in carrying out their daily tasks," the Court does not find that Plaintiff has adequately pleaded a due process claim. *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017).

### 2.    Conditions of Confinement Claims

Mr. Corley pleads facts that the Court construes as the bases for a series of claims concerning allegedly unconstitutional conditions of confinement at the GRVC. In its 2015 Opinion, the Court dismissed all of Plaintiff's conditions of confinement claims. Since that opinion, and in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Second Circuit has clarified the legal standard to be applied to claims for deliberate indifference under the Fourteenth Amendment.

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong"

showing that the conditions were "sufficiently serious" as to constitute objective deprivations of constitutional rights. *Id* at 29. Second, the pretrial detainee must satisfy what has been misleadingly referred to as the "subjective prong" by showing that the officer acted with deliberate indifference to the challenged conditions. *Id.* As the Second Circuit recently explained, this subjective "*mens rea* prong" must be analyzed objectively: rather than ask whether the charged official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," courts are to instead determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Id.* at 33, 35. The Court applies this framework to Mr. Corley's various allegations concerning his conditions of confinement at the GRVC.

### a.  Use of SecurPass Machines

Mr. Corley alleges that from May 2012 to January 2013, the Defendants used a "SecurPass" full-body X-ray machine to subject him to over forty body scans, that these scans exposed him to "harmful non-natural radiation," and that as a result, his "risk and fear of developing cancer increased." TAC ¶ 20. In the 2015 Opinion, the Court held that Plaintiff failed to state a claim for deliberate indifference to his health because he did not allege any facts to support the second prong of the test for such a claim: he did not allege that Defendants knew or believed that the SecurPass machine posed any risk to Plaintiff's health. 2015 Opinion, 2015 WL 5729985, at *10. In his amended complaint, Mr. Corley attempted to bolster his claims concerning the harm caused by the machines by first alleging that he was scanned more than forty times (as opposed to his previous allegation of thirty scans), and by contending that "Warden Duffy, Commissioner Schriro and the general public at large were apprehensive of exposure to non-natural radiation, given the uncertainty about the health and genetic consequences of even small emissions." TAC ¶ 20-22.

These additions to his complaint do not save Plaintiff's claim concerning the SecurPass machines, however, because he still fails to allege that Defendants "knew or should have known"

that "an excessive risk to health or safety" would result from the scans. *Darnell*, 849 F.3d at 35. That Defendants were "apprehensive" about radiation exposure does not indicate that they should have known of an excessive risk to Plaintiff's safety; pleading that officials were apprehensive falls short of pleading that a reasonable officer should have known of a serious harm and Defendants nevertheless imposed that harm.

In addition, the Court notes that courts in this district that have found that screenings from the SecurPass machine do not amount to an objectively serious harm for purposes of a deliberate indifference claim. *Middleton v. City of New York (In re RadPro SecurPass Scanner Cases)*, No. 13-cv-6095, 2014 WL 4054310, at *6 (S.D.N.Y. Aug. 13, 2014) ("[W]hile exposure to any amount of radiation poses some risk of harm—society chooses to, and indeed must, tolerate some level of radiation exposure."); *see also Walker v. Ponte*, No. 14-cv-8507, 2017 WL 2703560, at *3 (S.D.N.Y. June 21, 2017) (discussing an expert's findings after testing four SecurPass machines at Rikers Island, including one at GRVC, and explaining that the results led the expert to conclude "that the SecurPass machines used by DOC do not emit harmful levels of radiation to those scanned"), *but see Rahman v. Schriro*, 22 F. Supp. 3d 305, 313-14 (S.D.N.Y. 2014) (holding that when a plaintiff pleaded that he was subjected to at least two SecurPass scans a day and that each scan exposed him to a level of radiation higher than that emitted in airports, the complaint contained sufficiently plausible allegations such that the Plaintiff could demonstrate through discovery that a serious future risk of serious injury existed). The conclusions reached in these cases support the Court's conclusion that a reasonable officer should not have been expected to know that the SecurPass machine posed an excessive risk to Plaintiff's health.

Furthermore, the TAC fails to plausibly state facts to support a finding that the exposure to radiation caused by the SecurPass scans was "sufficiently serious." In order to allege facts to meet this objective test, a complaint must plead that the harm "the [detainee] suffered was 'sufficiently

serious that he was denied the minimal civilized measure of life's necessities."' *Darnell*, 849 F. 3d at 29.  Here, Plaintiff states in a conclusory fashion that each scan increased his risk of cancer, but alleges no facts to support that claim.  While it is true that prison officials may be found to be deliberately indifferent to future harm suffered by an inmate, even if the inmate shows no serious current symptoms, *see Helling v. McKinney*, 509 U.S. 25, 33 (1993), Plaintiff's pleading must still do more than "plead facts that are merely consistent with a defendant's liability," *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009).  Plaintiff's conclusory allegations that the scans increased his risk of future harm do not meet this pleading standard, and his claim concerning the SecurPass machine is therefore dismissed.

### b.  Lock-Out and Lock-Down Practices

Although the Court dismissed Plaintiff's allegations concerning various lock-out and lock-down practices at the GRVC to the extent Plaintiff alleged that these practices violated a liberty interest protected by the Due Process Clause, *see supra* § 1(e), those allegations may also be construed as raising a claim for unconstitutional conditions of confinement.  However, for the same reasons explained in the 2015 Opinion, Plaintiff's allegations do not plead the necessary requirements for such a claim.  Specifically, Plaintiff does not allege that the lock down practices resulted in an "objective deprivation" by showing that the conditions of his confinements "pose[d] an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 30.  The TAC contains no facts to suggest that the lock-downs caused him any harm whatsoever.  Plaintiff also fails to allege any facts to support the "mens rea" test of a conditions of confinement claim, as he does not allege that any Defendant "knew, or should have known" that the lock-down practices posed a risk to his health or safety. *Darnell*, 849 F.3d at 35.  In fact, Mr. Corley does not allege any Defendants' personal involvement in instituting the lock-downs; he merely alleges that they took place.  Plaintiff's allegations therefore do not contain a necessary prerequisite to plead a constitutional violation under

section 1983. *Farid*, 593 F.3d at 249. Accordingly, Plaintiff's claims concerning lock-down and lock-out practices are dismissed to the extent they are pleaded as a conditions of confinement claim.

### c. Hostile Environment

Mr. Corley alleges that GRVC officials provided "too few chairs and tables, allowed select inmates to occupy multiple chairs, [and] allowed gangs to monopolize the food, telephones and televisions," thereby "permit[ing] a hostile living environment to fester among inmates." TAC ¶ 17(g). These facts are no different from what Mr. Corley alleged in his SAC, and therefore the Court again concludes that these allegations fail to meet the objective prong necessary for conditions of confinement claims. That is, these deprivations are merely minor inconveniences that do not pose sufficiently serious risks to an inmate's health or safety. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim.").

### d. Failure to Protect

The TAC contains a number of allegations that the Court construes as seeking to raise a claim for GRVC officials' failure to protect Mr. Corley from gang-related violence. In addition to alleging that prison officials "permitted a hostile living environment to fester among inmates," he contends that he faced a substantial risk of harm when Defendants labeled him a "snitch" and a "child molester" and when they transferred Mr. Corley within the GRVC "knowing he would face adversity by moving from a 'Blood Unit' to a 'Crip Unit.'" TAC ¶¶ 27(a) (labeled a snitch); 27(c) (labeled a 'child molester'); 27(d) (transfer between units was "dangerous"); 27(l) (same).

In general, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988)). However, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials

responsible for the victim's safety." *Farmer*, 511 U.S. at 834. A claim that alleges failure to protect or intervene "is a Fourteenth Amendment violation where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.'" *Rosen v. City of New York*, 667 F. Supp. 2d 355, 359-60 (S.D.N.Y. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)) (internal quotation marks omitted). As a result, the Court must apply the two-prong framework for claims of deliberate indifference. That is, the inmate must show (1) that the failure to intervene or protect the inmate was sufficiently serious such that it caused "an unquestioned and serious deprivation of basic human needs" and (2) that the defendant acted with a sufficiently culpable state of mind. *Rosen*, 667 F. Supp. 2d at 360 (citations omitted). As stated above, following the Second Circuit's decision in *Darnell*, the second prong of this claim is measured by an objective standard: whether Defendants "knew or should have known" that a substantial risk serious harm would result from their failure to intervene. *Darnell*, 849 F.3d at 35.

Mr. Corley's allegations concerning the general existence of a "hostile environment" at the GRVC, which he contends was the result of a high concentration of gang members at the facility, do not rise to the level of a claim for failure to protect. Plaintiff does not plausibly allege that this hostile environment created a "substantial risk of serious harm." *Farmer*, 511 U.S. at 834. As the Court noted in its 2015 Opinion, violence is unfortunately a routine aspect of prison, and the fear of assault does not rise to the level of a constitutional harm. *See Jones v. Goord*, 190 F.R.D. 103, 108 (S.D.N.Y. 1999) ("Although no court approves of physical violence in the correctional system, the fact is that maximum security prisons house violent offenders, and confrontations between inmates are, to some extent, inevitable despite the best efforts of correction officers and prison officials to prevent them. Such incidents, standing alone, do not necessarily rise to the level of cruel and unusual punishment. Nor will 'fear of assault' by other inmates support a constitutional claim."). Mr. Corley only alleges two incidents of gang-related "violence" that occurred at the GRVC—one

when he was waiting alone in an Annex holding pen and was confronted by five Bloods gang members who "physically attacked" him, and one when he was in the "Dangerzone" stairwell and was approached by six Crips gang members. TAC ¶¶ 18(a); 27(l). Plaintiff does not allege, however, that any Defendant was aware of these confrontations. As the Court held in its 2015 Opinion, as a result, neither of these incidents supports an inference that any Defendant knew or should have known about the potential danger to Mr. Corley's safety and was thereby deliberately indifferent to his safety.

Mr. Corley's allegations concerning being labeled a "snitch" and a "child molester" also fail to state a claim for failure to protect. Courts in this circuit have held that a claim for deliberate indifference may lie when a prison official identifies an inmate as being an informant or a "snitch" in front of other inmates. *See, e.g., Allah v. Juchnewioz,* 1999 WL 562100, *3 (S.D.N.Y.1999) ("Many courts have recognized . . . in the context of Eighth Amendment analysis, the dangers a prisoner faces from his fellow inmates when labeled a snitch or informant."); *Hamilton v. Fischer,* 2013 WL 3784153, *15 (W.D.N.Y. 2013) ("Courts have recognized that being labeled a snitch in the prison environment can indeed pose a threat to an inmate's health and safety in violation of the Eighth Amendment.") (internal quotations and citations omitted). However, to state a claim on this basis, a plaintiff must show that he suffered actual physical harm; "[v]erbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983." *Bouknight v. Shaw*, No. 08-cv-5187, 2009 WL 969932, at *3 (S.D.N.Y. Apr. 6, 2009). Mr. Corley alleges that as a result of being called a "snitch," Plaintiff had "a verbal altercation with a kitchen worker over the matter." TAC ¶ 27(a). As a result of Defendant Moultrie's comments about Plaintiff's criminal charges, Plaintiff was "harassed by inmates accusing him of being a 'pedophile,'" was approached by inmates requesting to see Plaintiff's paperwork, and contends that inmates "held resentments" about Plaintiff. These allegations, taken together, do not support a conclusion that Plaintiff faced actual or

imminent harm as a result of being identified as a "snitch" or a "child molester." Mr. Corley's

allegations concerning his intra-facility transfers fail for the same reason—although Mr. Corley

alleges that Defendants knew that transfer from a "Blood Unit" to a "Crip Unit" was "dangerous,"

Mr. Corley concedes that he did not face actual physical harm during the post-transfer confrontation

with six Crips. TAC ¶ 27(l) ("Fortunately, Plaintiff was not assaulted after convincing the group he

was not a Blood."). Mr. Corley's complaint is devoid of factual allegations that give rise to an

inference that he faced a substantial or serious risk of actual physical harm, and therefore has not

met the objective prong of the deliberate indifference test. Any claim by Plaintiff for Defendants'

failure to protect is therefore dismissed.

### e.   "Personal Injury"

Mr. Corley brings a claim for "personal injury," alleging that Defendants denied him his

religious diet for multiple days, which resulted in "hospitalization for starvation." TAC ¶ 41.

Plaintiff contends that this claim is one of his state law tort claims, *see* Pl.'s Opp'n at 10, and the

Court addresses it as such below in its analysis of Mr. Corley's state law claims. Although Mr.

Corley expressly disclaims raising this issue as a constitutional tort, for the sake of completeness, the

Court analyzes the issue as a claim related to the conditions of his confinement under federal law.

In the 2015 Opinion, the Court held that Mr. Corley's hospitalization for starvation was

more than *de minimis*, and as a result, that he had stated a claim for physical injury. 2015 Opinion,

2015 WL 5729985, at *16. Many courts, however, view allegations concerning the deprivation of

food as a claim concerning conditions of confinement. *See, e.g.*, *Robles v. Coughlin*, 725 F.2d 12, 15-16

(2d Cir. 1983) ("[T]he Eighth Amendment prohibition against cruel and unusual punishment []

require[s] that prisoners be served nutritionally adequate food that is prepared and served under

conditions which do not present an immediate danger to the health and well being of the inmates

who consume it.") (citation omitted). The Court therefore applies the same framework that it has

for Mr. Corley's other conditions of confinement claims, and finds that he has failed to plead that the deprivation of food was objectively "sufficiently serious" to rise to the level of a constitutional violation.

Here, Mr. Corley's allegations do not suffice to state a claim. Mr. Corley alleges that he was denied "proper kosher meals" for six days in December 2012. TAC ¶ 23(f). He does not allege that he was deprived of *any* food or even edible food, but only that he was denied the food his religion required that he eat. The Court appreciates the impact of the prison's failure to provide Mr. Corley with his religion's required diet—he has, as stated below, pleaded a viable claim as a result. However, he has not stated a claim under the Fourteenth Amendment, which requires that he allege deprivation of "the measure of food necessary to maintain health," and he has not stated a claim based on the denial of food. *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014) (citation omitted). Where courts have found such a deprivation to be actionable, the plaintiffs asserted a complete denial of food or were provided food that was inedible. *See, e.g.*, *Banks v. Annucci*, 48 F. Supp. 3d 394, 407 (N.D.N.Y. 2014) (finding a plaintiff had stated a claim for deprivation of food where he alleged that defendants placed dust and dirt in his meals); *Newman v. Zenk*, No. 05-cv-759, 2007 WL 6888112, at *4 (E.D.N.Y. Mar. 29, 2007), *aff'd*, 309 F. App'x 535 (2d Cir. 2009) (plaintiff was served "uncooked, raw, spoiled or undercooked food items"). This claim is therefore dismissed.

### 3. Unreasonable Searches

Mr. Corley's complaint contains allegations that he was subjected to over thirty "excessive" cell searches, which resulted in damage to his property, as well as to a body cavity search. TAC ¶ 18(d).[7] He also complains of two searches in particular: one during a "unit search" on September

---

7 In opposing Defendants' motion, Plaintiff contends he "asserts no independent claim based on the 'unconstitutional cell searches.' Such facts are alleged solely to express the harassment and atypical conditions of confinement Plaintiff experienced." Pl.'s Opp'n at 6. Nevertheless, in construing Plaintiff's papers with

8, 2012, when Defendants McQuade and Thompson read his legal papers over a walkie-talkie, and another on December 6, 2012, when Plaintiff's cell was searched "at the direction of Captain Wynn or Ms. Moultrie" while Mr. Corley was receiving medical treatment. TAC ¶¶ 27(e), 27(j). In his opposition, Plaintiff also contends that he has pleaded a Fourth Amendment violation "based on being arbitrarily exposed to radiation with a reasonable expectation of finding contraband in his internal organs." Pl.'s Opp'n at 5. The Court construes these allegations as seeking to state claims under the Fourth Amendment. However, for substantially the same reasons these claims were dismissed in its 2015 Opinion, these claims are again dismissed.

The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). In analyzing the claims of a pre-trial detainee, the Second Circuit has explained that if a search was conducted by a prison official, "established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether the security needs could justify it." *U.S. v. Cohen*, 796 F.2d 20, 24 (2d Cir. 1988) (pretrial detainee retained sufficient expectation of privacy within his cell to challenge search ordered by the *prosecutor* for investigatory reasons rather than by a prison official for institutional security related reasons). As such, Mr. Corley's claim that he was subject to thirty cell searches does not state a claim under the Fourth Amendment. Regardless, as the Court explained in its 2015 Opinion, "[t]he Fourth Amendment prohibits only unreasonable searches," and "[t]he test of reasonableness . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*

---

the special solicitude required for *pro se* litigants, the Court analyzes these factual allegations as seeking to raise a separate claim under the Fourth Amendment.

*v. Wolfish*, 441 U.S. 520, 558-59 (1979). Plaintiff offers only his conclusion that the searches were "excessive," but provides no facts substantiating this assertion that would suggest that any of these searches were unreasonable. As a result, even if Mr. Corley maintained a privacy right in his cell, he has not stated a claim that the thirty cell searches were unreasonable in violation of the Fourth Amendment.

The Second Circuit has nevertheless recognized "that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy." *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir. 1992). In assessing an inmate's claim that this limited right was infringed, the Court must determine (1) "whether the inmate has exhibited an actual, subjective expectation of bodily privacy," and (2) "whether the prison officials had sufficient justification to intrude on the inmate's fourth amendment rights." *Harris v. Miller*, 818 F.3d 49, 57-58 (2d Cir. 2016) (citing *Covino*, 967 F.2d at 77-78) (internal quotation marks omitted). Mr. Corley alleges facts concerning two alleged intrusions on his bodily privacy: the body cavity search that was the result of one of the searches of his cell, and the use of the SecurPass scanner. Mr. Corley has articulated his subjective expectation of privacy in both searches. *See Covino*, 967 F.2d at 78 ("[W]e have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context.").

In considering whether prison officials were justified in intruding on Plaintiff's bodily privacy, courts must consider whether the claim challenges a prison regulation or policy, or instead challenges an isolated search. Here, the Court construes Mr. Corley challenge to what he describes as a "policy" of using these body scanners. TAC ¶ 22. If an inmate challenges a prison policy, courts apply the four-factor test set out in *Turner v. Safley*, 482 U.S. 78 (1987), which held that "the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The four *Turner* factors are:

> "(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities."

*Covino*, 967 F.2d at 78-79 (citing *Turner,* 482 U.S. at 89-90).

Here, a valid, rational connection exists between using a body-scanning machine to search inmates and the safety and security interests of a prison. The third and fourth *Turner* factors also favor Defendants here. Using a body scanner—which requires no physical contact between prison guard and prisoner—is a reasonable alternative to other kinds of searches that would be more intrusive, such as body cavity searches or pat-down searches. *See United States v. Ghailani*, 751 F. Supp. 2d 508, 514 n.35 (S.D.N.Y. 2010) (citing a government declaration noting that "no ready alternatives" existed to a policy of visual body cavity searches, "other than possibly the use of a body-scan machine," which was not available to the federal prison system at the time). The use of the SecurPass machine therefore does not state a claim under the Fourth Amendment.

Even body cavity searches, which are arguably a more intrusive way of searching prisoners for contraband, have withstood Fourth Amendment challenges. *See, e.g., Castro-Sanchez v. N.Y. State Dep't of Corr. Servs.,* No. 10-cv-8314, 2011 WL 6057837, at *9 (S.D.N.Y. Dec. 6, 2011) ("Routine random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment."); *Bell*, 441 U.S. at 558-60 (holding that a visual body cavity strip-search was reasonable in light of the "serious security dangers" in prison). Mr. Corley does not allege any facts about his body cavity search except that it took place, and therefore the TAC does not raise any inference that the body cavity search was not done in a reasonable manner. Accordingly, Mr. Corley's claims concerning unreasonable searches are dismissed.

### 4. Religious Liberty Claims and Equal Protection

Mr. Corley alleges that he "suffered harassment and discrimination" on the basis of race and religion when his request to change religious preference from "None" to "Jewish" was denied, when his request to obtain religious texts was denied, and when he was denied kosher meals for six days in December 2012. The Court construes these allegations as raising claims under the Free Exercise Clause of the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Equal Protection Clause of the Fourteenth Amendment.

### a. Free Exercise & RLUIPA

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 283 U.S. 342, 348 (1987); *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) ("Prisoners retain their right to religious freedom even when incarcerated."). However, recognizing that a prisoner's free exercise rights may necessarily be limited by virtue of being incarcerated, the Supreme Court has explained that a regulation burdening a prisoner's religious freedom will be constitutional so long as the regulation "is reasonably related to a legitimate penological interest." *O'Lone*, 482 U.S. at 349 (citations omitted). Under the Free Exercise Clause, Courts evaluate the reasonableness of a prison regulation using the four-factor test articled in *Turner*, articulated above by the Court in evaluating Plaintiff's Fourth Amendment claims. *Salahuddin v. Goord*, 467 F.2d 263, 274 (2d Cir. 2006). On the other hand, "the RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 714-16 (2005). RLUIPA protects inmates by providing that a government shall not "impose . . . a substantial burden on the religious exercise" on persons in certain institutions "unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling

interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a)(1).

"The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* at 274-75. Defendants are correct that "inmates enjoy no constitutional or legal right to receive religious materials at government expense." *Lloyd v. City of New York*, 43 F. Supp. 3d 254, 265 (S.D.N.Y. 2014) (citing *Cruz v. Beto,* 405 U.S. 319, 323 (1972)). Mr. Corley's allegations concerning the Rabbi's refusal to provide him with a Torah therefore do not state a claim. The Second Circuit has long held that the free exercise of religion does include, however, "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d. Cir. 1975).

Defendants contend that because Plaintiff does not explicitly allege that he sincerely holds Jewish religious beliefs, that he has also not stated a claim that the denial of kosher food or the initial rejection of his request to change his religious preference substantially burdened his religious exercise. Defs.' Mot. at 22. The Court declines to adopt Defendants' narrow reading of Mr. Corley's pleadings. Plaintiff pleads that he filed a form to change his religious preference, and that he "was hospitalized after fainting from starvation, caused by refused to eat non-kosher foods." TAC ¶¶ 23(a), 23(f). These allegations, taken together and construed liberally, sufficiently allege that Mr. Corley sincerely held religious beliefs that required him to eat kosher food, and that Defendants significantly interfered with those religious beliefs by initially preventing him from acquiring a "Jewish ID" that would give his access to kosher meals, and by denying him kosher meals once he received that ID.

Plaintiff has sufficiently pleaded the personal involvement of a number of Rikers officials in this deprivation; in addition to Rabbi Richtman, Defendants Captain Merrill, Captain Myers, and Captain Proverbs took part in restricting Plaintiff's receipt of kosher meals. Mr. Corley's allegations

meet his initial burden under the Free Exercise Clause and RLUIPA, and Defendants' motion is denied as to those claims. Plaintiff's allegations as to Defendants Moultrie, Duffy, and Schriro's personal involvement in this alleged deprivation, however, are insufficient to state a claim under Section 1983. The TAC vaguely alleges that these supervisory Defendants "later upheld" Rabbi Richtman's decision, but provides no context or factual support for this assertion. TAC ¶ 23(c). Without more, the Court cannot conclude that these three Defendants were personally involved in this incident. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (citation omitted). Additionally, courts in this Circuit have held that personal involvement is also a necessary component of a valid RLUIPA claim. *See Joseph v. Fischer,* 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009); *Pilgrim v. Artus*, No. 9:07-cv-1001, 2010 WL 3724883, at *14 (N.D.N.Y. Mar. 18, 2010), *report and recommendation adopted*, No. 9:07-cv-1001, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation."). Defendants Moultrie, Duffy, and Schriro are therefore dismissed as to Plaintiff's religious liberty claims.

### b. Equal Protection

Mr. Corley alleges that the denial of his request to change his religion was "likely due to racism, because the Plaintiff was Black and the mistreatment of Black inmates by the Rabbi was an on-going [sic] issue." TAC ¶ 23(d). The Court construes this allegation as a claim under the Equal Protection Clause. The Supreme Court has explained that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "To state a claim for an equal protection

violation, [a plaintiff] must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).

Although Mr. Corley does not explicitly state that there was a similarly situated group that was treated differently, reading the complaint to raise the strongest claims it suggests, the comments concerning the reasons for Rabbi Richtman's denial of Plaintiff's change-of-religion request sufficiently allege that a state actor discriminated against Plaintiff on the basis of his race. As such, Mr. Corley has stated a claim for race-based discrimination in violation of the Fourteenth Amendment. Further, because the New York State Constitution also contains an equal protection clause, N.Y. Const. art. I, § 6, which is "comparable to the Fourteenth Amendment Equal Protection Clause of the Federal Constitution," the Court also finds that Mr. Corley has stated a claim for violation of that state constitutional provision. *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 519 (S.D.N.Y. 2010), *aff'd*, 694 F.3d 208 (2d Cir. 2012) (citing *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 592 (2d Cir. 1989)).

To the extent Mr. Corley contends that he has a "class-of-one" equal protection claim, however, that claim fails. A class-of-one claim exists "where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Second Circuit has held that to succeed on such a claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds, Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). The first requirement is exacting; class-of-one plaintiffs must "prove

'intentional disparate treatment,' that is, demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 143 (2d Cir. 2010) (citing *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir. 2001)). Mr. Corley does not allege that there were similarly-situated individuals who were treated differently from him, or any facts to suggest that the Rabbi intentionally treated him differently than anyone else, and therefore Plaintiff fails to state a class-of-one equal protection claim.[8]

### 5. Harassment & Retaliation Claims

Mr. Corley's TAC includes a number of claims that he groups under the umbrella description of "Harassment and Retaliation." He asserts that during his time at the GRVC, he filed "numerous" grievances, complaints, and letters about the living conditions at the facility, and that as a result, he was retaliated against and harassed by GRVC officials. TAC ¶¶ 24, 27. To prevail on a First Amendment retaliation claim brought under 42 U.S.C. § 1983, a prisoner must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). The allegations "must support an inference that the

---

[8] Although Mr. Corley contends that he asked the Rabbi "how non-Jews already have a 'Jewish ID' for kosher meals," this does not satisfy the requirement that a plaintiff plead that other similarly-situated individuals were treated differently. TAC ¶ 23(b). Mr. Corley does not allege that the Rabbi made any decision whatsoever about those "non-Jews." In fact, the complaint alleges that the Rabbi commented that he had "no control" over the other inmates who received kosher food. TAC ¶ 23(b). Plaintiff has therefore not plausibly pleaded facts that would support a finding that Rabbi Richtman intentionally treated Plaintiff differently than any other inmates.

protected conduct was a 'substantial or motivating factor for the adverse actions taken by prison officials.'" *Dorsey v. Fisher,* 468 F. App'x 25, 27 (2d Cir. 2012) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003).

The Second Circuit requires that such claims be "supported by specific and detailed factual allegations," not stated "in wholly conclusory terms." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015), *overruled on other grounds by Swierkiewicz*, 534 U.S. at 506) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)); *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (retaliation claims that are "unsupported, speculative, and conclusory" may be dismissed on the pleadings). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has cautioned district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan*, 794 F.3d at 295 (internal quotation marks omitted); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted).

"It is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" *Dolan*, 794 F.3d at 294 (citing *Graham*, 89 F.3d at 80). Mr. Corley has alleged that he filed "numerous" grievances, thereby satisfying the first prong of a retaliation claim. The Court must next determine whether any of the actions Plaintiff complains of as retaliation constitute an adverse action. Analysis of this factor "must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered

adverse." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (internal quotation marks and brackets omitted)).

Mr. Corley alleges that a number of Defendants' acts were done in retaliation for his filing of grievances: Deputy Warden Texeira yelled at Plaintiff about his coffee-related grievance and suggested that Plaintiff was a "snitch" in front of other inmates; Plaintiff's cell was searched multiple times, causing the destruction and disorganization of his papers; the contents of his legal papers were read over a walkie-talkie by Defendant Thompson; Defendant Moultrie insinuated that Plaintiff was a "pedophile" when he attempted to file a grievance against her; Plaintiff was physically removed from Defendant Moultrie's office after attempting to file a grievance; and Plaintiff was moved from Unit 15B to Unit 9A and back again.

"Insulting or disrespectful comments directed at an inmate generally do not rise" to the level of a constitutional violation. *Davis*, 320 F.3d at 353. As such, Defendant Texeira's alleged insinuation that Plaintiff was a "snitch" was not an adverse action for purposes of a claim for retaliation. *See, e.g.*, *Dorsey*, 468 F. App'x at 27 ("[Plaintiff's] claims of retaliatory verbal abuse by [Defendant] do not include any allegations of physical harm, nor are they alleged with any specificity to suggest that they would deter a prisoner of ordinary firmness from exercising his constitutional rights."); *Morales v. Mackalm*, 278 F.3d 126, 131-32 (2d Cir. 2002), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002) (finding that an officer's reference to plaintiff as a "stoolie," intended to stigmatize plaintiff as an informant, was insufficient to support a retaliation claim); *Dawes*, 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant" were insufficient to support a retaliation claim). Similarly, Plaintiff's allegations that he was "repeatedly harassed" about kosher meals and that unit officers observed the food he ate, without more, are too vague to amount to an adverse action, however rude or upsetting they might have been. *See Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations

of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

However, "verbal threats may constitute adverse action . . . depend[ing] on their specificity and the context in which they are uttered." *Lunney v. Brureton,* No. 04-cv-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007). Here, Mr. Corley has pleaded sufficient detail surrounding the comments made by Defendant Moultrie after Plaintiff attempted to file a grievance against her: she "screamed out" comments about Plaintiff's criminal charges while he was exiting her office, such that other people in the vicinity could hear her comments. Those comments resulted in other inmates harassing and threatening Plaintiff, although he was eventually able to assure his harassers that he was merely a "pimp" and not a "child molester." Ms. Moultrie's comments were made with the kind of specificity that would deter an individual of ordinary firmness from filing more grievances, as there is evidence that the comments actually risked inciting other inmates against Mr. Corley. The comments therefore constitute an adverse action. Furthermore, the comments were made immediately following Plaintiff's attempt to engage in the protected activity in question, supporting an inference that the adverse action was substantially motivated by Plaintiff's attempt to engage in the protected activity of using the prison grievance system.

However, Mr. Corley's allegation that he was yelled at and "physically remove[d]" from Ms. Moultrie's office by unnamed officers does not contain a similar level of specificity. Even where a Plaintiff alleges physical harm, Courts have held that the harm must be more than *de minimis* to state a constitutional claim. Being physically removed from an administrative office only amounts to such *de minimis* harm, and is not the kind of action that would deter a person of ordinary firmness from continuing to exercise his or her constitutional rights. *See Rivera v. Goord,* 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (dismissing a retaliation claim against a defendant who "shoved" an inmate on the ground that the harm was *de minimis*).

Similarly, Mr. Corley's allegations that various cell searches were retaliatory do not state a claim, as courts in this circuit generally hold that cell searches cannot be the basis of a retaliation claim. *See Carl v. Griffin,* No. 08-cv-4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("A cell search is not considered to be an adverse action.") (citation omitted); *Salahuddin v. Mead,* No. 95-cv-85881, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002); *Walker v. Keyser,* 98-cv-5217, 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001) ("[R]etaliatory searches are not actionable under § 1983."); *Bey v. Eggleston,* 96-cv-3302, 1998 WL 118158, at *4 (S.D.N.Y. Mar. 17, 1998) ("A search of an inmate—even for retaliatory reasons—does not implicate a constitutional right."); *Gadson v. Goord,* 96-cv-7544, 1997 WL 714878, *7 (S.D.N.Y. Nov. 17, 1997) ("[S]earches of cells implicate no constitutional rights, even if the search is arbitrary or retaliatory in nature."). Moreover, Mr. Corley's allegations that the searches he complains of "were for harassment and no other legitimate purpose" are conclusory and are not supported by the "specific and detailed factual allegations" required to state a retaliation claim. *Dolan,* 794 F.3d at 295; *see also Soto v. Iacavino,* No. 01-cv-5850, 2003 WL 21281762, at *2 (S.D.N.Y. June 4, 2003) ("Alleging the ultimate fact of retaliation in a conclusory manner is insufficient.").

Courts have held, however, that confiscation or destruction of an inmate's legal documents can constitute an adverse action for purposes of a retaliation claim. *See, e.g., Roache v. Hogan*, No. 9:13-cv-0253, 2015 WL 5316209, at *14 (N.D.N.Y. Sept. 11, 2015) (precluding inmate from accessing legal papers in storage constituted an adverse action); *Edwards v. Horn*, No. 10-cv-6194, 2012 WL 473481, at *15 (S.D.N.Y. Feb. 14, 2012), *report and recommendation adopted*, No. 10-cv-6194, 2012 WL 760172 (S.D.N.Y. Mar. 8, 2012) (finding an adverse action where defendants' allegedly retaliatory destruction of plaintiff's legal documents prevented him from prosecuting an action that was subsequently dismissed for failure to prosecute); *Smith v. City of New York*, No. 03-cv-7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) ("The action was specifically directed against plaintiff . . .

[and] the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers.").

Here, Mr. Corley alleges that his legal papers were damaged or discarded when he was seeking medical treatment after he was denied kosher food, that officers who read his legal papers over a walkie-talkie, and that his papers were "deliberately dump[ed]" and disorganized. In order to state a claim for retaliation, however, Plaintiff must allege a causal connection between the protected activity of filing prison grievances and the adverse action of the destruction of legal papers. Plaintiff alleges he filed multiple grievances—some of which were against Defendant Moultrie—within the year before the alleged destruction of his legal paperwork while he was seeking medical treatment— acts that alleged took place at the direction of Ms. Moultrie. *See Espinal*, 558 F.3d at 129 (holding that a six-month lapse between plaintiff's protected First Amendment activity and the allegedly retaliatory conduct supported an inference of causation); *Lindner v. Int'l Business Machines Corp.*, No. 06-cv-4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) ("[R]etaliation claims are rarely dismissed pursuant to Rule 12(b)(6) where the plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct"). The complaint does not plead a causal connection between Mr. Corley's filing of grievances about prison conditions generally and the actions of Defendants McQuade and Thompson, who allegedly read portions of Plaintiff's legal paperwork out loud. The TAC does not allege that Plaintiff ever filed grievances complaining about these particular individuals, or moreover that these individuals were aware of the multitude of complaints Plaintiff had made. Absent such allegations, even in construing Plaintiff's papers with special solicitude, the Court cannot conclude that the TAC adequately alleges that Plaintiff's grievances were a "substantial or motivating factor" in McQuade and Thompson's actions. Mr. Corley's retaliation claims for the destruction of his legal papers therefore survive, but only as to Defendant Moultrie.

Finally, Plaintiff alleges that his two intra-facility transfers were retaliatory. While "[p]rison officials . . . have broad discretion in making transfer determinations[, t]hey may not, however, transfer prisoners solely in retaliation for the exercise of constitutional rights." *Salahuddin v. Perez,* No. 99-cv-10431, 2006 WL 266574, at *5 (S.D.N.Y. Feb. 2, 2006) (quotation marks and internal citations omitted). Mr. Corley was transferred twice in the year that he was housed at the GRVC, once from Unit 15B to Unit 9A for "unknown reasons," and again from Unit 9A back to Unit 15B "out of retaliation for his numerous complaints." TAC ¶¶ 27(d); 27(l). Mr. Corley provides no evidence beyond this conclusory statement that supports an inference that his filing of grievances was "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003). The TAC is devoid of allegations indicating who made the first decision to transfer Plaintiff, and although it does allege that Defendant Wynn made the decision for the second transfer, the TAC does not allege that this Defendant was the subject of—or was even aware of—any of Plaintiff's numerous grievances. The TAC itself states that the reason for the transfer was "unknown." TAC ¶ 27(d). Plaintiff's claims concerning these alleged retaliatory transfers are therefore dismissed.

### 6.      Municipal Liability Under Section 1983

In addition to the various constitutional claims raised in the TAC, Mr. Corley asserts liability against Defendant the City of New York. A municipality is not vicariously liable for its employees' actions under 42 U.S.C. § 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. 658, 691 (1978)). Municipalities are, however, liable for "their own illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). A plaintiff seeking to hold a municipality liable under § 1983 must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Rodriguez v. Winski*, 973 F. Supp. 2d 411, 425 (S.D.N.Y. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff may satisfy the "policy

or custom" prong in one of four ways: by alleging the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).

"[T]he City cannot be liable under *Monell* where plaintiff cannot establish a violation of his constitutional rights." *Holland v. City of New York*, 197 F. Supp. 3d 529, 552 (S.D.N.Y. 2016) (citing *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (internal punctuation omitted)). The Court has dismissed all of Mr. Corley's allegations of constitutional harm except for his religious liberty claims, his equal protection claims, and his retaliation claims as they pertain to Ms. Moultrie's comments insinuating Plaintiff was a "pedophile" and the alleged destruction of his legal papers. Mr. Corley has not pleaded any specific facts support the contention that that these remaining alleged constitutional deprivations were the result of City customs or policies. He contends only that the City "created customs and implemented or upheld unconstitutional policies which . . . denied Plaintiff his constitutional right to practice his faith." TAC ¶ 29(d). That is the type of conclusory allegation that, even when read with solicitude, does not state a claim for municipal liability. *See Plair v. City of New York*, 789 F. Supp. 2d 459, 469-70 (S.D.N.Y. 2011) (finding allegations that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation" were conclusory and failed to state a *Monell* claim); *see also Abreu v. City of New York,* 657 F. Supp. 2d 357, 360-61 (E.D.N.Y. 2009) ("[The plaintiff's] complaint succinctly states one of the

core legal concepts animating *Monell* liability. But it does absolutely nothing else."). Plaintiff's *Monell* claims are therefore dismissed.

### B.     State Law Claims

Mr. Corley also purports to bring state law claims for gross negligence and negligent infliction of emotional distress. Although the Court held in its 2015 Opinion that Plaintiff's claim for negligence survived Defendants' motion to dismiss the SAC, it does not reach the same conclusion in analyzing the TAC.

#### 1.     Emotional Distress

For the same reasons as stated in the Court's 2015 Opinion, Plaintiff's claim for negligent infliction of emotional distress is dismissed. Under New York law, such a claim requires allegations of conduct that are "so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community." *Wilson v. City of New York*, 743 N.Y.S.2d 30, 34 (N.Y. App. Div. 2002) (citations omitted). Mr. Corley's vague allegations that he suffered "severe emotional distress" due to Defendants' acts or omissions do not meet this exacting standard, and furthermore are conclusory. Accordingly, this claim is dismissed.

#### 2.     Negligence and Gross Negligence

Finally, Mr. Corley claims that all Defendants owed him various duties and breached those duties, including the duty to protect him from harm, to preserve his legal papers, to provide a religious diet and literature, to prevent harm to future health, and to prevent retaliation. To the extent Mr. Corley alleges that his hospitalization from starvation constitutes a state law claim, the Court also analyzes that allegation as a claim for negligence. "In order to prevail on a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach

thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825, *reargument denied*, 28 N.Y.3d 956 (N.Y. 2016) (internal citation omitted).  In the prison context, the New York Court of Appeals has concluded "that the State owes a duty of care to inmates for foreseeable risks of harm," meaning what the State "knew or had reason to know" or what the State "is or should be aware" of.  *Sanchez v. State of New York*, 99 N.Y.2d 247, 255 (2002).

Even if the Court assumed that Defendants owed these enumerated duties to Plaintiff, the Court does not find that Mr. Corley's conclusory allegations are sufficient to state a claim for negligence.  As an initial matter, Mr. Corley's allegations simply state that these duties were owed, the "failure of which" resulted in various harms.  TAC ¶ 40.  Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not state a claim for relief.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Furthermore, the Court has already analyzed the entirety of Mr. Corley's TAC in the context of his claims brought under Section 1983 and found that no reasonable officer knew or should have known of a sufficiently serious harm posed to Plaintiff.  That conclusion applies with equal force when examined within the framework of a state law negligence claim.  For instance, Mr. Corley's allegations that Defendants should have protected him from gang violence caused by other prisoners does not state a claim because Plaintiff has not alleged that any Defendants were aware of the incidents of violence complained of.  *Sanchez*, 99 N.Y.2d at 256 ("The mere occurrence of an inmate assault, without credible evidence that the assault was reasonably foreseeable, cannot establish the negligence of the State.").  Similarly, Plaintiff has not alleged facts to support a conclusion that any Defendant knew or should have known that the SecurPass scanners increased Plaintiff's risk of cancer.  Simply put, none of Plaintiff's allegations contain sufficient factual support for the Court to conclude that any of these harms were proximately caused by Defendants' acts or omissions.  Plaintiff's state law claims are therefore dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. As set forth above, Mr. Corley's claims for violation of his religious liberty, race-based discrimination, and retaliation based on the destruction of his legal papers and on Ms. Moultrie's comments about Mr. Corley's criminal record survive. All of Plaintiff's other claims are dismissed. Defendants Duffy, Schriro, Wynn, McQuade, Texeira, Thompson, and the City of New York are dismissed, given that all claims against them have been dismissed.

The Court does not grant Plaintiff leave to amend his complaint, as he has already had two opportunities to cure deficiencies raised in his previous pleading. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("Leave to amend, though liberally granted, may properly be denied for . . . repeated failure to cure deficiencies by amendments previously allowed . . .).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court requests that counsel for Defendants provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is instructed to terminate the motion pending at docket number 89 and to mail Plaintiff a copy of this order by certified mail.

SO ORDERED.

Dated: September 28, 2017
      New York, New York

                                GREGORY H. WOODS
                            United States District Judge